414 F.2d 1135
 71 L.R.R.M. (BNA) 2150, 134 U.S.App.D.C. 239
 INTERNATIONAL ASSOCIATION OF MACHINISTS, DISTRICT LODGE 94,
AFL-CIO, et al., Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, Lou Ehlers
Cadillac and Thomas Cadillac, Inc., Intervenors.
 No. 21972.
 United States Court of Appeals District of Columbia Circuit.
 Argued Jan. 15, 1969.
Decided May 2, 1969.
Certiorari Denied Oct. 27, 1969.
 
 Mr. Herbert M. Ansell, Los Angeles, Cal., of the bar of the Supreme Court of California, pro hac vice, by special leave of court, with whom Mr. Plato E. Papps, Washington, D.C., was on the brief, for petitioners.
 Mr. Richard N. Chapman, Atty., National Labor Relations Board, with whom Messrs. Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, and Marcel Mallet-Prevost, Asst. General Counsel, National Labor Relations Board, were on the brief, for respondent.
 Mr. Richard W. Lund, Los Angeles, Cal., with whom Mr. Joseph A. Wheelock, Jr., Los Angeles, Cal., was on the brief, for intervenor, Lou Ehlers Cadillac.
 Mr. H. Burdette Fredricks, Los Angeles, Cal., with whom Messrs. Henry W. Low, Los Angeles, Cal., and Edward A. McDermott, Washington, D.C., were on the brief, for intervenor, Thomas Cadillac, Inc.
 Before BURGER, TAMM and LEVENTHAL, Circuit Judges.
 BURGER, Circuit Judge:
 
 
 1
 Petitioners seek review of an order of the National Labor Relations Board dismissing a complaint alleging that Thomas Cadillac and Lou Ehlers Cadillac violated Section 8(a)(1) and (5) of the Act, 29 U.S.C. 158(a)(1) and (5), by failing to recognize and bargain with the petitioning Unions.
 
 
 2
 Prior to the time Thomas and Ehlers began operations, two factory-dealerships in Los Angeles were owned and operated directly by Cadillac Division of General Motors Corporation. During the period these two factory dealerships were operated by Cadillac Division, the Machinists Union was certified as the bargaining agent for a single unit covering the operations of both outlets along with a third branch which was a used car outlet disposing of cars taken in trade by the two retail branches. The Painters Union was certified later during this period as bargaining agent for a single unit of auto body painters for both Cadillac outlets. The two Unions bargained jointly with General Motors and a single contract was made for both retail outlets. The contract provided the same wages, grievance procedures and other benefits for all employees wherever assigned, and a common seniority list covered both branches. A unique feature of the single contract provided transferability of seniority, vacation and holiday pay at all General Motors plants wherever located. All employees were covered by General Motors' pension and insurance programs. This contract was in effect when General Motors sold its outlets to the two independent franchise dealers.
 
 
 3
 While General Motors operated the Cadillac outlets in Los Angeles they were managed and administered as a single unit with a central accounting system, central personnel, credit and purchasing controls. When General Motors decided to terminate direct retail operations in Los Angeles it so advised the two Unions and subsequently reached agreement with them on the rights of the General Motors' employees.[1] Thereafter, the sale of assets and franchise agreements were separately made with the two new dealers who had no business relationship with each other.
 
 
 4
 At the time General Motors terminated its operations it employed 117 employees in service departments, 75 at what was to become the Thomas outlet and 42 at the Ehlers outlet. All were union members except three mechanics and one painter. Prior to the actual transfer of assets, the unions requested that the new dealers meet with them to 'clarify the rights of the employees.' Ehlers responded that this was premature and Thomas made no reply.
 
 
 5
 The new Cadillac dealers immediately began operations under separate competing franchise contracts. Thomas hired a total of 63 service employees, 16 of them former General Motors employees who were union members; Thomas also hired a new supervisory staff of 7 persons only 3 of whom had worked for the former General Motors outlets. One assistant sales manager and an accounting supervisor who had worked for unrelated General Motors outlets were also hired.
 
 
 6
 Ehlers hired 11 service employees and several salesmen who had worked in the predecessor General Motors operation, Ehlers brought in former employees of his own in most supervisory posts. The Board found on undisputed evidence that both dealers hired their new staffs solely on the basis of competence and were not influenced by the union membership of job applicants. The Board also found that neither dealer had any connection with General Motors except by virtue of the franchise as a dealer.
 
 
 7
 In the face of the refusals by Thomas and Ehlers to negotiate the claims of the Unions, picketing of both dealers was commenced. The Unions made no claim to represent a majority of the employees of Thomas and Ehlers. Nevertheless, the Examiner concluded that Thomas and Ehlers were successor employers and hence required to recognize the Unions and bargain with them. The Board found this determination to be erroneous and held that Thomas and Ehlers did not take over or succeed to the General Motors bargaining unit. In concluding that the new franchise dealers did not take over or succeed to General Motors' bargaining unit the Board relied on the changes in structure, organization, management, and employees, and the alterations in the relationship of the two retail outlets to each other, to General Motors, and to the public.
 
 
 8
 The record amply supports the Board's determination that Thomas and Ehlers selected new employees on the basis of skill, ability and experience 'and were in no way influenced by union membership of the job applicant.' Even a cursory comparison of the differences in the enterprises operated by General Motors and those operated by Thomas and Ehlers shows a marked lack of identity. The outlets operated by Thomas and Ehlers were in direct competition for sales and service not only with each other but all other dealers, General Motors and unrelated, whereas under General Motors ownership there was not aggressive advertising and sales promotion vis-a-vis other General Motors dealers. Thomas and Ehlers compete with each other for sales to customers while the General Motors managed enterprise was relatively indifferent in the sense that General Motors did not have the same interest in competing with franchise Cadillac dealers as do Thomas and Ehlers. As noted, management, accounting, and advertising were centrally controlled under the factory management but are totally separate and independent after the new franchise dealers took over.
 
 
 9
 Once Thomas and Ehlers took over, no common seniority was feasible and no transfers from one establishment to the other-- or to an unrelated General Motors operation-- were available. Thomas and Ehlers each established a new management and supervisory hierarchy. Each was free to fix wages and working conditions subject only to the normal competition for skilled service personnel in the local labor market. From a management point of view, given the fiercely competitive nature of retail auto sales, each enterprise was now 'on its own'; attitudes on sales and performance which might have been tolerable to General Motors would not be acceptable to independent dealers.
 
 
 10
 A comparison of these factual aspects indicates at once that this record is clearly distinguishable from successorship cases cited by the petitioners. See, e.g., K. B. & J. Young's Super Markets, Inc. v. NLRB, 377 F.2d 463, 466 (9th Cir. 1967). These comprehensive changes, and others we deem it unnecessary to detail, furnish support for the Board's determination that no successorship existed. To have concluded otherwise would have deprived the new employees of Thomas and Ehlers-- a majority of whom had no prior affiliation with Petitioners-- of rights guaranteed them by Section 7 of the Act to be represented by an agent of their own choice.
 
 
 11
 It should be noted that the Board's finding of nonsuccessorship did not turn on the fact that a majority of the new employees were not members of the old bargaining unit; if the composition of the unit was the controlling factor in determining successorship, a purchaser might well seek to avoid application of the successorship principle by refusing to hire the seller's employees.[2] Of course, if the purchaser deliberately sets out to destroy a union when he takes over a going business other consequences of a violation of the Act might well arise. As previously noted, however, there is undisputed evidence on the record that Thomas and Ehler's selection of new employees to staff the significantly altered operations was based only on skill and ability, and that union affiliation played no part.
 
 
 12
 Our review satisfies us that the record contains substantial evidence which supports the Board's finding that Thomas and Ehlers were not successors of the General Motors' dealerships, thereby neutralizing the contention that the prior existence of a valid certification created a presumption of continued majority status which obligated Thomas and Ehlers to bargain with the Unions. The substantial nondiscriminatory change in personnel found by the Board, along with the changes in operational structure, negated any such presumption. See NLRB v. John Stepp's Friendly Ford, Inc., 338 F.2d 833 (9th Cir. 1964); cf. International Union, United A., A. Agr. Implement Wkrs. v. NLRB, 129 U.S.App.D.C. 282, 394 F.2d 757, cert. denied,393 U.S. 831, 89 S.Ct. 100, 21 L.Ed.2d 102 (1968).
 
 
 13
 On substantial supporting evidence the Board found that the changes in operational format and nondiscriminatory personnel turnover negated a finding of successorship. Those findings effectively overcome the presumption of continuing majority status thereby placing on the Union the burden of making this showing. Petitioners have not claimed, nor are they able to demonstrate, this circumstance.
 
 The petition for review is
 
 14
 Denied.
 
 LEVENTHAL, Circuit Judge (concurring):
 
 15
 I concur in the majority opinion's finding of substantial evidence in the record to sustain the Board's determination in this case that these intervenors did not inherit a duty from General Motors to recognize the union as representatives of their employees after the assumption of operations at these two separate locations. As the majority opinion forcefully points out, there is a significant difference in business objective between the independent Thomas and Ehlers dealerships, on the one hand, and the General Motors factory-affiliated service establishment, on the other, and this is a telling factor.[1]
 
 
 16
 I add a separate statement to obviate the possibility that some language in the majority opinion be extended so as to choke the Board in its evolution of sound successorship doctrine. It is with some diffidence that I speak further to this point at this time, but I am comforted as I approach the task by the reflection that if what I have to say merits amendment, it may at least help others in the delineation of their thoughts. This subject of successorship is shrouded in somewhat impressionist approaches, if I may judge from oral argument. Analysis that is clear and realistic is welcome in all areas of law, of course, but is particularly valuable in regard to 'successorship' doctrine. For this is a multifaceted concept that, properly applied, may permit and even facilitate orderly transfers of capital and assets that take due account of appropriate interests of employees and thus by providing transitions with a minimum of disruption may advance the cause of industrial peace.
 
 
 17
 1. The purchaser of a business does not take title unencumbered by the labor relations obligations of his predecessor. He is well advised to analyse labor title as much as real title. Rooted in our competitive enterprise system is a strong policy in favor of free transfer of assets and flexibility of new management attuned to economic efficiency. This is not, however, an absolute value. It must be balanced against the policies of protection for labor and stability of labor relations that are embodied in the federal labor statutes.[2] Under the policies of these laws the new owner does not start with a completely blank slate. There is law as well as economic appraisal underlying the reality that the value of a going business is affected by existing personnel arrangements and practices, whether there is enhancement or diminution in good will value.[3]
 
 
 18
 2. I am particularly concerned lest some of the language in the majority opinion may be taken to indicate that the acid test of 'successorship' is whether the work force of the old enterprise is carried over to the new company. While that fact may be significant for certain situations, it ignores the substantial interest of employees in 'protection * * * from a sudden change in the employment relationship.' See John Wiley & Sons v. Livingston, 376 U.S. 543, 549, 84 S.Ct. 909, 914, 11 L.Ed.2d 898 (1964).[4] Employees of the old enterprise may, for some limited purpose, stand in a relationship to the owners of the new enterprise that has some protection during the hiatus between the time of sale and actual take-over. They are not necessarily to be equated with strange applicants for employment in the new enterprise.[5] It is not needful, perhaps not even appropriate, for me to delineate the nature of the relationship nexus between the old employees and incoming management. That will depend on the shape of the facts. In some cases that can be denominated full successorship there may be a complete transfer of the duty to bargain with representatives already chosen by the employees.[6] The continuance of such a duty would depend on a finding of full successorship. This would require some retention of employees and a continuity of business purpose between the old and new enterprise. Obviously the mere transfer of assets, even on a wholesale basis, does not amount to continuity if the equipment is being put to a different industrial use.[7] Apparently less significance would be due a change in location.[8]
 
 
 19
 Where there is a continuity of business purpose there may be a preliminary and partial bargaining relationship during the transition period even though, for all the parties can know, there will ultimately be such a change, made in good faith, that there will not be a 'full successorship' and that the previous choice of representative by the employees will no longer be valid.
 
 
 20
 The subject of such preliminary bargaining may include matters such as preferences for certain employees should the purchasing enterprise choose to retain workers with the skills possessed by the seller's employees. This is a matter of particular concern to the employees and the union. See Martin Marietta Corp., supra note 5; Compare Internation Longshoremen's Ass'n, Member Fanning's dissenting opinion, supra note 5.[9] While the union might properly insist on the right to participate in a responsible and prompt fashion in negotiations preliminary to the opening under new management, the union, of course, would not be entitled to drag out the preliminary bargaining process.
 
 
 21
 3. There is always, obviously, tension between the principle of entrepreneurial freedom and economic efficiency, on the one hand, and stability of labor relations on the other. In the context of the pretakeover situation the balance is particularly delicate. The existence and extent of duty to bargain will depend on the circumstances and issues involved, and its delineation is properly a matter for the Board in the first instance. The manifest difficulties call to mind what the Supreme Court said in Fibreboard Paper Pds. Corp. v. NLRB, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233:
 
 
 22
 * * * although it is not possible to say whether a satisfactory solution could be reached, national labor policy is founded upon the congressional determination that the chances are good enough to warrant subjecting such issues to the process of collective negotiations. (p. 214, 85 S.Ct. p. 404)
 
 
 23
 4. In this particular case the General Counsel's complaint did not charge a failure to bargain over the limited issue of continuation of employment for the General Motors' employees. Rather it charged broadside that the new employers failed to recognize and bargain with the unions, as representatives of the newly constituted employee units of the new enterprises, with respect to hours, wages, and other terms of employment.
 
 
 24
 This is an entirely different matter from bargaining with a union over issues involved in constituting the new work force. Before the new enterprise selects its employees, it can, of course, bargain with the representatives of the old employee group without any conflict with principles of self-determination. However, an order from the Board directing Ehlers and Thomas to bargain with the union as the representative of their current employees might very well have undercut the principle of employee free choice that lies at the very heart of the Labor Acts. The cases involving the presumption of full continued majority status for a certified union are primarily instances where the purchasing enterprise has retained all or most of the old employees.[10]
 
 
 25
 On balance I think the Board was within its discretion in rejecting the Union's contention and concluding that here the new enterprises lacked the substantial identity and continuity of business purpose that required continued recognition of the union as employee representative after the new concerns and new rosters took over operations. The changes in method of operation, including significantly the change from the sheltered manufacturer-connected facility to the independent distributor orientation, and the substantial dissimilarities in personnel rosters, arrived at without discrimination against the old employees, support the Board's conclusion.[11]
 
 
 
 [1]
 In his concurring opinion, Member Jenkins stated:
 Meetings (between General Motors and) the Union resulted in a Supplement Agreement, dated April 28, 1965, which provided that, in anticipation of General Motors' closing Bixel and Wilshire, employees who left to take another job could voluntarily be laid off out of line of seniority. In addition, General Motors agreed to give employees vacation and absence pay prorated to the date of termination, lump sum payment of amounts accumulated under the General Motors Income Security Plan, retirement benefits for employees having reached the permissible retirement age of 60 and having the minimum 10 years of service, nd pensions to those between the ages of 55-60 who otherwise qualified for retirement. A sizable number of employees took advantage of these provisions. (Joint Appendix 60-61).
 
 
 [2]
 See Note, Obligations of Successor Employers: Recent variations on the John Wiley Theme, 2 Ga.L.Rev. 574, 582-586 (1968)
 
 
 [1]
 An interesting comparison is found in NLRB v. Alamo White Truck Service, Inc., 273 F.2d 238, 241 (5th Cir. 1959)
 
 
 [2]
 See generally, Barbash, Status of the Collective Bargaining Agreement Under Wiley v. Livingston: A Management Counsel's View, New York University, Eighteenth Annual Conference on Labor 259 (1966); Feller, Status of the Collective Bargaining Agreement Under Wiley v. Livingston: A Union Counsel's View, New York University, Eighteenth Annual Conference on Labor 277 (1966); Note, The Successor Employer's Duty to Arbitrate: A Reconsideration of John Wiley & Sons, Inc. v. Livingston, 82 Harv.L.Rev. 418 (1968); Note, Obligations of Successor Employers: Recent Variations on the John Wiley Theme, 2 Ga.L.Rev. 574 (1968); Comment, Successor Employer's Obligation to Remedy Unfair Labor Practices, 68 Colum.L.Rev. 1602 (1968)
 
 
 [3]
 Thus a purchaser of a business may be called upon to remedy unfair labor practices of the prior owner. See, e.g., U.S. Pipe & Foundry Co. v. NLRB, 398 F.2d 544 (5th Cir. 1968). The court took pains to recognize U.S. Pipe's status of 'good faith purchaser' but held, nevertheless, that its freedom of action was limited by the policy of the Labor Acts. As the court pointed out, the balance between freedom for the purchaser and fairness to the employees must be struck in equitable terms: whether the requirement of bargaining (or reinstatement as was the issue in U.S. Pipe) is necessary to protect employees and whether there is an undue encroachment on the successor's freedom. 398 F.2d at 547-548
 
 
 [4]
 The search for continuity in the retention of employees may be appropriate where the issue is successorship for the purpose of establishing a duty to arbitrate under a contract, compare United Steelworkers of America v. Reliance Universal Inc., 335 F.2d 891 (3d Cir. 1964) with Retail Store Employees Union Local 954 v. Lane's of Findlay, Inc., 260 F.Supp. 655 (N.D. Ohio 1966). It may also be controlling on the question of whether a duty to bargain with the union exists after the take-over. See infra
 
 
 [5]
 See Chemrock Corp., 151 N.L.R.B. 1074, 1078 (1965), where the Board said: '* * * where * * * the only substantial change wrought by the sale of a business enterprise is the transfer of ownership, the individuals employed by the seller of the enterprise must be regarded as 'employees' of the purchaser as that term is used in the Act. Such individuals possess a substantial interest in the continuation of their existing employee status, and by virtue of this interest bear a much closer economic relationship to the employing enterprise than * * * the mere applicant for employment. * * *' See also Martin Marietta Corp., 159 N.L.R.B. 905 (1966); cf. International Longshoremen's Ass'n, 158 N.L.R.B. 1687, 1697 (1966) (Member Fanning, dissenting). Compare the Supreme Court's approach in John Wiley & Sons v. Livingston, 376 U.S. 543, 549, 84 S.Ct. 909, 914, which involved the question of whether the arbitration provision of a labor contract had to be honored by a succeeding employer: 'Employees, and the union which represents them, ordinarily do not take part in negotiations leading to a change in corporate ownership. The negotiations will ordinarily not concern the well-being of the employees, whose advantage or disadvantage, potentially great, will inevitably be incidental to the main considerations. The objectives of national labor policy, reflected in established principles of federal law, require that the rightful prerogative of owners independently to rearrange their businesses and even eliminate themselves as employers be balanced by some protection to the employees from a sudden change in the employment relationship.' For the view that Chemrock is a germinal decision that 'presages the birth of new doctrines in order to accommodate the Wiley decision with Board law,' see Sangerman, The Labor Obligations of a Successor to a Unionized Business, 19 Lab.L.J. 160, 177-178 (1968)
 
 
 [6]
 See e.g., Overnite Transp. Co. v. NLRB, 372 F.2d 765 (4th Cir. 1967). The obligations of subsequent management depend on the extent of identity and continuity between the old and new enterprise and the timing of labor's demands. Arbitration, bargaining, remedying unfair labor practices of the seller, and engaging in preliminary discussion impose different burdens on new management and the degree of continuity required to trigger these obligations varies. Compare Note, The Successor Employer's Duty to Arbitrate: A Reconsideration of John Wiley v. Livingston, supra, note 2, at 429
 
 
 [7]
 Compare Northwest Galvanizing Co., 168 N.L.R.B. No. 6 (1967)
 
 
 [8]
 If the business is carried on in the same location, this is persuasive evidence of some continuity. Compare Piano & Musical Instrument Workers Union, etc. v. W. W. Kimball Co., 379 U.S. 357, 85 S.Ct. 441, 13 L.Ed.2d 541 (1964), reversing per curiam 333 F.2d 761 (7th Cir. 1964). The Seventh Circuit had relied on the shift in locale as a factor negating a finding of successorship. Compare also Northwest Galvanizing Co., supra note 7, where the Board noted:
 'We deem it highly significant that Respondent here did not purchase a business, but purchased for addition to its already existing business the equipment utilized as a small part of the overall * * * operation. This is not a case in which the buyer assumes control of the seller's business and later decides to move elsewhere. The equipment purchase was part of a long term expansion program of Respondent which temporarily utilized the premises of the seller of that equipment until its own facilities were sufficiently expanded to permit consolidation thereof with its own identical operations.'
 
 
 [9]
 Compare K. B. & J. Young's Super Markets, Inc. v. NLRB, 377 F.2d 463, 466 (9th Cir.), cert. denied 389 U.S. 841, 88 S.Ct. 71, 19 L.Ed.2d 105 (1967), where the court said 'John Wiley & Sons v. Livingston * * * establishes that where there is substantial continuity of identity in the employing enterprise a change in ownership does not, by operation of law, automatically terminate all rights of the old employees and that such rights may remain the legitimate subject of dispute. Importantly included in such potentially bargainable issues, in our view, is continuity of employment * * *.'
 
 
 [10]
 Compare Overnite Transp. Co. v. NLRB, supra note 6, where the court upheld a Board finding that the purchasing company violated the Labor Acts by making unilateral changes in terms of employment after assuming managerial responsibility. The duty to bargain with the union attached immediately after take-over since there were 'no significant changes * * * in operation' and the company had offered employment to all of the employees in the former unit. 372 F.2d at 768. In the case before us the old employees constituted a minority of the new work. Compare also NLRB v. John Stepp's Friendly Ford, Inc., 338 F.2d 833 (9th Cir. 1964) (no duty to bargain after take-over where there is 'substantial change in the identity of work force.'); NLRB v. Alamo White Truck Service, Inc., supra note 1
 
 
 [11]
 This would not be the case where the purchaser refused to hire the old employees simply for the purpose of avoiding recognition of the union. See, e.g., K. B. & J. Young's Super Markets, Inc. v. NLRB, supra note 9