**NATIONAL LABOR RELATIONS
BOARD, Petitioner,**

v.

**BAND–AGE, INC., Respondent.**

No. 75–1355.

United States Court of Appeals,
First Circuit.

Decided April 13, 1976.

Argued Jan. 6, 1976.

Janet C. McCaa, Washington, D.C., Atty., with whom John S. Irving, Jr., Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and John H. Ferguson, Atty., Washington, D.C., were on brief, for petitioner.

Henry Schuman, New York City, for respondent.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

McENTEE, Circuit Judge.

This case is before us upon the application of the Board for enforcement of its order issued against Band-Age, Inc. ("Band-Age"). The Board found that Band-Age was a successor to Paulis Silk Company which until its demise had long had a collective bargaining agreement with the Textile Workers Union of America, AFL-CIO ("Union"). On the basis of this finding of successorship, the Board held Band-Age in violation of § 8(a)(5) and (1) of the National Labor Relations Act for refusing to recognize and bargain with the Union. The Board's order in pertinent part required Band-Age to recognize and bargain collectively with the Union as the exclusive bargaining representative of its employees.[1]

There are few broad governing principles in the area of successorship. *NLRB v. Bos-*

ton Needham Industrial Cleaning Co., 526 F.2d 74 (1st Cir. 1975). As the Supreme Court has recently noted, "in light of the difficulty of the successorship question . . . emphasis on the facts of each case as it arises is especially appropriate." *Howard Johnson Co. v. Detroit Local Joint Executive Board, Hotel and Restaurant Employees Union,* 417 U.S. 249, 256, 94 S.Ct. 2236, 2240, 41 L.Ed.2d 46, 53 (1974). In the present case, the facts upon which the Board's finding of successorship is predicated are essentially undisputed. Until December 1973, the Paulis Silk Company was engaged in manufacturing elastic bandages at its Clay Street plant in Central Falls, Rhode Island.[2] The company sold its regular bandages to four customers. It also sold "seconds" to the Surgicot Company. Paulis Silk operated four departments within the plant: weaving, finishing, packaging, and shipping. In the 1960's Paulis Silk was at the peak of its production, using approximately 80,000 square feet of floor space and employing 250 to 300 workers in 15 to 20 job classifications, who operated 150 broadloom and narrowloom machines. The company produced five types of elastic bandages. The Textile Workers Union has represented Paulis Silk employees for many years, negotiating a number of successive collective bargaining agreements.

In the early 1970's Paulis Silk began to phase out its operations. In 1972 there were 150 to 170 employees, and during most of 1973 the plant operated with approximately 80 employees. In April 1973, the Union executed a collective bargaining agreement covering the remaining employees. This union-security contract was effective through December 31, 1973, and provided for a shortened term and increased severance pay based on Paulis Silk's representation that it would be out of business by the end of the calendar year. By the end of 1973 only 25 to 30 employees re-

1. *Band-Age, Inc. and Textile Workers Union of America,* AFL-CIO, 217 N.L.R.B. No. 71, 89 LRRM 1522 (1975).

2. In addition to the manufacturing performed at its Clay Street plant Paulis Silk had utilized

additional space in other nearby locations; however, the record does not indicate when this occurred, and it is not relevant to our disposition here.

mained. During the latter part of that year Paulis Silk sold about 50 of its broadloom machines and supporting equipment to one of its customers, Becton-Dickinson, for use in a factory to be set up in Puerto Rico.[3] In late November 1973, Surgicot hired Paulis Silk's plant manager, John Peacock, and its controller, Robert Greco, to serve at the Clay Street facility as plant manager and administrative manager, respectively, for Band-Age which had been incorporated the previous month.[4] Thereafter Band-Age executed a lease with Paulis Silk, renting for a five-year term 20,000 square feet of floor space at the Clay Street plant, 46 narrow weaving machines, and various office machinery and equipment. Band-Age also purchased Paulis Silk's inventory, work in process, and raw materials. Peacock supervised the relocation of narrowloom machinery within the plant in preparation for Band-Age's operations. On December 18, 1973, when Paulis Silk ceased business operations, Peacock told all the remaining employees that they should "watch the newspaper" and that Band-Age was "going to take applications for employment, and that anyone that was interested in coming back to work there would come in and fill out an application." In the first week of January 1974, Band-Age advertised for employees in a local newspaper and started hiring.

Band-Age hired all three of Paulis Silk's departmental supervisors, its only floorlady, and other of its employees. When Band-Age began operations on January 14 its work force consisted of 37 employees, 35 of whom had been Paulis Silk employees and members of the Union. Currently, Band-Age's employees work under 7 or 8 job classifications within the same four basic departments of weaving, finishing, packaging, and shipping as Paulis Silk had maintained. Band-Age produces a narrow elastic bandage[5] which it sells to Surgicot and

several other customers. Plant manager Peacock testified that "[m]ost of the employees . . . are doing the same jobs [as at Paulis Silk]." On April 3, 1974, the Union sought recognition from Band-Age as the exclusive bargaining representative for its employees. Band-Age declined to recognize the Union, thus precipitating this action.

The central question in a successorship case is whether there has been "a change of ownership not affecting the essential nature of the enterprise," *Tom-A-Hawk Transit, Inc. v. NLRB,* 419 F.2d 1025, 1026–27 (7th Cir. 1969); *see NLRB v. DITMCO, Inc.,* 428 F.2d 775, 780 (8th Cir. 1970); if no essential change is found "the successor employer must recognize the incumbent union and deal with it as the bargaining representative." *Tom-A-Hawk Transit, Inc. v. NLRB, supra* at 1027. In deciding this issue the Board must examine the "totality of the circumstances." *NLRB v. Boston Needham Industrial Cleaning Co., supra* at 77. Our inquiry in this case is guided by the latest Supreme Court case involving a new employer's duty to bargain, *NLRB v. Burns International Security Services,* 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972). In concluding there that "where the bargaining unit remains unchanged and a majority of employees hired by the new employer are represented by a recently certified bargaining agent there is little basis for faulting the Board's implementation of the express mandates of § 8(a)(5) and § 9(a) by ordering the employer to bargain with the incumbent union," 406 U.S. at 281, 92 S.Ct. at 1579, 32 L.Ed.2d at 69 the Supreme Court has identified two factors of basic importance: (1) the continued appropriateness of the bargaining unit; and (2) the permissibility of assuming the continued existence of a union majority.

---

3. A number of Paulis Silk's supervisors, office personnel, and employees had also gone to Puerto Rico to assist in establishing Becton-Dickinson's factory there.

4. Surgicot continues as the primary customer of Band-Age. The record does not further dis-

close the precise relationship between the two companies.

5. The bandage is similar to, but not identical with a narrow bandage formerly produced by Paulis Silk.

We have little doubt that here the bargaining unit remained appropriate. Although the business had shrunk, the nature of the work was still the same; the same machines (albeit fewer) were used; the same plant (although less space) was worked in; the same type of product (although not the identical bandage, and not several types) was made; the same supervisors were in charge; and while there were fewer employees, most did the same work as previously, and all but two of the employees had worked for the predecessor employer. These indicia, as we read them, point to the continued existence of the unit, and indeed, a continued enterprise rather than a new one. The operations had shrunk, but the nature of the employment remained essentially the same.

■ The more difficult question, and one to which the shrinking of operations remains relevant even though the unit has been found appropriate, is whether a presumption of continued union majority status was warranted. Quantitatively, *Burns* instructs us to consider the percentage of the successor's employees who have been union members working for the former employer.[6] In *Burns*, the rehiring of 27 former employees along with 15 new ones was enough for the Court to approve the NLRB's drawing an inference of continued union majority despite the possibility that only 7 of the successor workforce had originally voted for the union.[7] Here the mathematical inference is considerably stronger for 35 of the 37 Band-Age employees had previously been employed by Paulis Silk and were union members there.

The inference is weaker in one respect. In *Burns*, the election was only several months prior to the succession, and the

Court may have had in mind the almost conclusive presumption of a continued union majority for one year following Board certification. Here, by contrast, the union had been with the plant for many years, the union security clause required every worker to join, and recognition had been attained, apparently, when Paulis Silk's employees numbered in the hundreds. Theoretically, all of the 35 employees hired by Band-Age could be unwilling to vote for the union today. The purely statistical probabilities, of course, are against that proposition;[8] but the fact of union membership here does not imply as strongly an attachment for the union. This difference, however, does not warrant the opposite inference; and absent a change of employers the presumption of continued majority support would unquestionably be appropriate, rebuttable only upon the employer's showing of a good faith doubt. The real question here is why, apart from the differences in the enterprise which a particular succession may have produced (which, as we have noted, were not fundamental in this case), the mere presence of a new employer should change this settled principle.

■ We see no persuasive reason to vary the law which would prevail in the absence of a change of ownership. A successorship situation requires sensitivity to the interests of both the entrepreneur and the employees. The task of determining the appropriateness of the bargaining unit should give full consideration to the differences in operations contemplated by the employer. But, if it can be said that the employer is reaping the advantages of continuity, the employees' interest in some stability of representation during a period of volatility takes on added significance. *See generally*

---

6. While *Burns* is not unambiguous on this point, permitting a reading that the relevant percentage is the number of carryover employees compared to the size of the predecessor's workforce, we agree with *Boeing Co. v. International Ass'n of Machinists*, 504 F.2d 307 (5th Cir. 1974), that in a duty-to-bargain context the percentage should be of the successor's workforce. The reference is explicable because in *Burns* the predecessor employer and the suc-

cessor employer both employed the same number. *See also* Note, 88 Harv.L.Rev. 759 at 771 n. 76.

7. *See* 88 Harv.L.Rev. at 772, n. 81.

8. Given random selection, the smaller group will be representative of the larger. To select for antiunion sentiments, of course, would be a violation of § 8(a)(3).

Morris & Gaus, *Successorship of the Collective Bargaining Agreement: Accommodating Wiley and Burns*, 59 Va.L.Rev. 1359 (1973). While there is no recent evidence of the employees' continuing support of the union, there has been no attempt by the employer to demonstrate a good-faith doubt about that support. The narrow issue here, then, is: in the absence of positive evidence of continued support of the union, as demonstrated by a recent election or other proof of current attitudes, should the Board indulge a presumption of continuity or discontinuity of allegiance? Were the latter to be the law, we confess some difficulty in line drawing. How long ago must the choice of the bargaining agent have been made to be deemed of no consequence? Should it make a difference how the bargaining agent was chosen? Should the amount of turnover in the labor force make a difference? We would be reluctant either to adopt arbitrary time limits or to engage in a complex factor-weighing exercise. At least in this case, where 94 percent of the successor's employees came from the predecessor's all-union workforce, we think that the Board could reasonably conclude, in the absence of direct evidence, that union support continued. Further, the diminution of the enterprise did not represent changes so substantial from a labor-relations perspective as to compel the rejection of the presumption of a continued majority. *See generally Zim's Foodliner, Inc. v. NLRB*, 495 F.2d 1131 (7th Cir. 1974).

■ Band-Age also contends that although the union had been the recognized representative of the Paulis Silk employees, this fact is no indication that they, after discharge (with severance pay) necessarily maintained union ties or continued union membership. While discharge and severance pay obviously signal the end of employment, they may have little bearing on continued reliance on a union for representation. Offsetting the specific factors of formal discharge and severance pay in this case are the facts that the employees were told to watch the papers, encouraged to sign up, and that one employee was even allowed to keep his things in his locker in the interim. Band-Age places great stress on the four-week hiatus between Paulis Silk's closing in mid-December, and Band-Age's opening the following January. While the Board has sometimes relied on a substantial hiatus between the termination of the predecessor's operations and the commencement of the new employer's operations in finding no successor obligation to bargain, it has done so only where the hiatus in operations is "one of many factors pointing to such a substantial transformation in the nature of the predecessor's operations that a real question was presented, by the combination of circumstances, as to the employees' desires with regard to representation". *United Maintenance & Manufacturing Co., Inc.*, 214 N.L.R.B. No. 31, 87 LRRM 1469, 1472 (1974). However, the factual circumstances of the present case appear to afford no such basis for questioning the employees' desires as to representation by the Union. *See NLRB v. Daneker Clock Co.*, 516 F.2d 315 (4th Cir. 1975) (per curiam); *see also C. G. Conn, Ltd.*, 197 N.L.R.B. 442, 445–46, 80 LRRM 1387, 1388–89 (1972), enforced, 474 F.2d 1344 (5th Cir. 1973) (mem.).

■ Band-Age also contends that a successorship finding is unwarranted because it did not purchase substantial assets or goodwill from Paulis Silk and did not obtain a covenant not to compete. However, we do not find substantial merit to this claim for several reasons. First, Band-Age leased floor space, machinery, fixtures, furniture and equipment from Paulis Silk. The fact that the transfer took the form of a lease rather than an outright sale is not of great significance for purposes of determining the rights and obligations under the Act. *See Tom-A-Hawk Transit, Inc. v. NLRB, supra* at 1027. Further the finding of successorship has been upheld even where the transfer of the enterprise involved assignment "[of] leasehold interests in the . . . buildings," and where the purchaser "did not agree to buy . . . good will or other intangibles, and did not generally assume . . . liabilities." *Zim's Foodliner, Inc. v. NLRB, supra* at 1133–34.

**6**

Band-Age further contends that it ought not to be held a successor because the scope of its operations was far smaller than that of its predecessor in both the size of its workforce [9] and the number of its products. While change in the size and scope of operations of the new employer is a relevant consideration, *see International Ass'n of Machinists, District Lodge 94, AFL-CIO v. NLRB*, 134 U.S.App.D.C. 239, 414 F.2d 1135 (D.C. Cir.), *cert. denied*, 396 U.S. 889, 90 S.Ct. 174, 24 L.Ed.2d 163 (1969); *J. P. Mfg. Co.*, 194 N.L.R.B. 965, 79 LRRM 1216 (1972), nevertheless diminution in size does not necessarily preclude a finding of successorship. *See NLRB v. Boston Needham Industrial Cleaning Co., supra* at 77; *see also NLRB v. Armato*, 199 F.2d 800, 803 (7th Cir. 1952). After examining the factual circumstances of this case the Board found that the differences between Paulis Silk and Band-Age were not sufficient for the latter to avoid the successor obligation. As we noted earlier, the Board found [10] that although Band-Age uses only a portion of Paulis Silk's machinery (a substantial portion of which had been transferred to Becton-Dickinson in Puerto Rico), virtually all of Band-Age's machinery is from Paulis Silk; and that although the narrow elastic bandage made by Band-Age is not exactly the same as that previously produced by Paulis Silk, it is similar enough to be made with the same machinery. Moreover, the Board noted that Band-Age's operations were so similar to those of its predecessor that most of its employees were doing the same jobs they had performed previously. On such a record the Board could properly find that whatever changes had occurred would not significantly affect employee attitudes. *NLRB v. Boston Needham Industrial Cleaning Co., supra* at 77; *see Zim's Foodliner, Inc. v. NLRB, supra*. In sum,

our review of the factual circumstances of this case indicates that the Board's finding of successorship was supported by substantial evidence and its administrative determination must be sustained.

*The petition of the Board for enforcement of its order is granted.*

LEVIN H. CAMPBELL, Circuit Judge (dissenting).

My views are generally similar to those of the dissenting member of the Board and of Judge Pell who dissented in *Zim's Foodliner, Inc. v. NLRB*, 495 F.2d 1131, 1144 (7th Cir. 1975). The court in *Zim's* held in a comprehensive opinion that the purchasers of several markets from a nationwide supermarket chain had a duty to bargain with former employee representatives. Judge Pell took the view, however, that changes in size and operational methods of the new employers made it unreasonable to presume that the old union still represented a majority of employees within the greatly diminished bargaining units.

Here, Band-Age employs only about one-seventh the workforce and about one-third of the floorspace that Paulis Silk employed when the latter was at full capacity. Band-Age has fewer than one-half of Paulis Silk's job classifications, produces a single product, and sells to a markedly different and more restricted clientele. Moreover, unlike the situation that obtained in *NLRB v. Burns Security Services*, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1971), the Paulis Silk employees did not elect the Union on the eve of the change in employers. Rather the Union's status as bargaining agent dates back (as Judge Pell wrote in *Zim's, supra*) to "ancient history". Selection of the Union occurred many years ago at a time when Paulis Silk was presumably op-

---

**9.** While Paulis Silk at its peak had 250 to 300 employees, this number had diminished substantially by 1972, and during 1973 was approximately 80 to 100, with a complement of only about 25 at the end of 1973. It would appear that, as the Administrative Law Judge noted in his opinion, "any fair comparison between Band-Age and Paulis Silk must be with Paulis Silk at least during its final year in

business and . . . not . . . at its employment peak 8 to 10 years earlier."

**10.** The Board, after considering the record, affirmed the findings and conclusions of the Administrative Law Judge, and we therefore treat the latter's findings of fact as those of the Board.

erating with its full complement of 250 or 300 employees. How many, if any, of the Band-Age employees who once worked for Paulis Silk ever actually voted for the Union is unknown. Indeed, it is not known that an election was ever held. And the last contract negotiated between Paulis Silk and the Union was written to terminate in December, 1973, and provided for severance pay, reflecting the expectation that Paulis Silk would cease operations in December, 1973, thus ending that chapter of industrial relations.

Under these circumstances, I find it too speculative to adopt as a "presumption" that when Band-Age commenced operations nearly a month after Paulis Silk ceased, a majority of its employees desired or even anticipated representation by the Union. To be sure, nearly all of them had worked at Paulis Silk and had been members of the Union as required by the collective bargaining agreement. But given a new employer, a different business, and a more intimate unit, it is perfectly possible that the employees had no desire to reestablish the Union in its former role.

The premise of the National Labor Relations Act is industrial democracy, requiring an employer to bargain with the representative of a majority of its employees. This democratic principle must, of course, yield to practicality and the need for industrial peace, as rules limiting the frequency of elections illustrate. *See e.g., Brooks v. NLRB*, 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125 (1954). But such rules, presuming the continuity of majority sentiment, evolved within the frame of a single enterprise. While they may be appropriately extended to genuine successor entities, they should not apply where the original bargaining unit and nature of the enterprise have been radically altered. I fear that the enlargement of the successorship doctrine to accommodate such a case may sweep aside the requirement that the Union have roots in the actual wishes of the employees. *Cf. International Ladies' Garment Workers' Union, AFL-CIO v. NLRB*, 366 U.S. 731, 81 S.Ct. 1603, 6 L.Ed.2d 762 (1961). Here it

would be simple to require an expression of the wishes of the 37 current employees rather than to presume, somewhat woodenly, that the earlier-expressed wishes of a different group of employees working for a different employer remain effective.