**INTERNATIONAL UNION OF PETROLEUM & INDUSTRIAL WORKERS, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**IRWIN INDUSTRIES, INC., Respondent.**

Nos. 91–1428, 91–1483.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 26, 1992.

Decided Dec. 15, 1992.

Laurence D. Steinsapir, with whom Henry M. Willis and Susan L. Catler were on the brief, for petitioner in No. 91–1428.

James T. Winkler for respondent in No. 91–1483.

Margaret E. Luke, Attorney, N.L.R.B., with whom Jerry M. Hunter, Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, and Linda Dreeben, Supervising Atty., were on the brief, for respondent in No. 91–1428 and petitioner in No. 91–1483.

Before: EDWARDS, SENTELLE and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

In December 1986, Irwin Industries, Inc. ("Irwin") succeeded Stockmar International, Inc. ("Stockmar") as the employer designated to perform maintenance contracts at two Southern California oil refineries, one owned by Chevron U.S.A., Inc. ("Chevron") and the other owned by Texaco Oil Company ("Texaco"). Stockmar was a party to a multiemployer collective bargaining agreement with the International Union of Petroleum and Industrial Workers ("Union"), and this agreement covered the Stockmar maintenance employees working at the Chevron and Texaco refineries. Irwin hired the former Stockmar employees when it assumed the maintenance contracts at the two locations, and the employees then continued to work pursuant to the same conditions that were in existence when Stockmar was the employer. Following the successorship in employers, the Union demanded bargaining rights for a unit composed of the former Stockmar employees and Irwin's existing unrepresented work force of refinery maintenance employees. Irwin acceded to this demand and recognized the Union as the bargaining agent for the maintenance employees. Irwin and the Union then executed a collective bargaining agreement.

Subsequently, unfair labor practice charges were filed with the National Labor Relations Board ("NLRB" or "Board") against Irwin and the Union, and complaints were issued. The Board found that Irwin had violated sections 8(a)(1) and (2) of the National Labor Relations Act ("Act"), 29 U.S.C. § 158(a)(1), (2) (1988), in recognizing the Union and entering into a collective bargaining agreement, allegedly because the Union had failed to demonstrate that it represented a majority of Irwin's refinery maintenance employees. For like reasons, the Board also found that the Union had violated section 8(b)(1)(A) of the Act, 29 U.S.C. § 158(b)(1)(A) (1988). Finally, the Board found that, because of the Union's alleged minority status, Irwin had violated section 8(a)(3) of the Act, 29 U.S.C. § 158(a)(3) (1988), and the Union had violated section 8(b)(2) of the Act, 29 U.S.C. § 158(b)(2) (1988), by agreeing to a union security provision in the collective bargaining agreement.

The case is now before the court on petition of the Union to review the order of the Board requiring the Union to disclaim recognition by Irwin, and to cease giving effect to the collective bargaining agreement executed by Irwin and the Union. The Board has cross-applied for enforcement of its order. In a consolidated case, the Board has applied for enforcement of its order requiring Irwin to withdraw recognition of the Union and to cease giving effect to the collective bargaining agreement executed with the Union. Because there is no substantial evidence to justify the Board's decision, and because the Board misapplied established law to the facts, we deny the petition and cross-petition for enforcement and grant the Union's petition for review.

This case presents a classic example of "successorship." The change in employers from Stockmar to Irwin resulted in no meaningful change in the employees' conditions of employment: the employees hired

by Irwin all did exactly the same job, for the same pay, for the same supervisors, using exactly the same equipment. Furthermore, the Board specifically found that the unit of employees newly recognized by Irwin was appropriate for bargaining. In these circumstances, Irwin was a "successor" to Stockmar and the Union was entitled to a presumption of continued majority status. Thus, Irwin properly recognized the Union as the bargaining agent for a unit composed of the maintenance employees at the Chevron and Texaco refineries and Irwin's previously unrepresented maintenance employees at other refineries.

## I. Background

During the periods of time relevant to the instant case, Irwin and Stockmar were maintenance contractors servicing oil refineries and industrial plants in Southern California. Stockmar, along with Bay Western Industrial Maintenance, Inc. and Northwestern Industrial Maintenance, Inc., was party to a multiemployer collective bargaining agreement with the Union. The agreement was effective from July 1, 1984 to June 30, 1987, and covered a bargaining unit comprised of refinery and industrial maintenance employees from the three firms.

In July 1986, Chevron solicited bids for a contract to perform maintenance service at its refinery in El Segundo, California. Texaco contemporaneously solicited bids for maintenance work at its refinery in California's Carson/Wilmington area. Both Chevron and Texaco awarded their contracts to Stockmar. On October 1, 1986, Stockmar began performing under its new contracts with Chevron and Texaco. Stockmar also extended its multiemployer collective bargaining agreement to cover the 193 employees at the Chevron site and the 144 employees at the Texaco site.

Stockmar provided maintenance services to Chevron and Texaco until December 11, 1986, when it ceased operations due to financial difficulties. Chevron and Texaco officials then made arrangements with Irwin to take over the maintenance work

Stockmar had been providing at the two sites.

Irwin began operations at both the Texaco and Chevron refineries on December 11, the same day Stockmar departed. Irwin hired all of the 337 former Stockmar employees working at the two sites. The newly hired employees at both locations performed the same work at the same wages and classifications as they had while working for Stockmar. The employees also used the same equipment, which Irwin had borrowed or bought, and worked under former Stockmar supervisors retained by Irwin. Finally, to avoid any disruption, Irwin guaranteed Stockmar's payroll obligations for the preceding week.

After hiring the Stockmar employees, Irwin had a total of 565 employees in its refinery division. This number included the 193 former Stockmar employees at the Chevron site and the 144 such employees at the Texaco site, all of whom were represented by the Union, and 228 previously hired employees, performing work at other refineries, who were not represented.

The same day Irwin took over for Stockmar, the Union requested that Irwin recognize it as the collective bargaining representative for all of its refinery maintenance division employees. Irwin refused. The Union responded by filing a charge against Irwin with the Board, alleging an unlawful failure to recognize and bargain with the Union. After discussions between the parties, Irwin agreed to recognize and bargain with the Union, and the Union withdrew its charge. Irwin recognized the Union on April 6, 1987, and the parties entered into a collective bargaining agreement on May 15, 1987. The agreement covered all of Irwin's refinery maintenance employees, and contained a union security clause requiring all employees to become members of the Union after 30 days of employment. Irwin notified its employees on May 20, 1987 that it had entered into an agreement with the Union.

After investigating charges that Irwin and the Union had committed various unfair labor practices in establishing a bargaining relationship, the Regional Director

of the Board filed complaints on May 26 and June 22, 1987. On May 3, 1989, an Administrative Law Judge ("ALJ") held that Irwin had properly recognized the Union because the Union was entitled to a presumption of continued majority status following the transfer of the 337 Stockmar employees to Irwin. *See* ALJ Decision at 16, *reprinted in* Appendix ("A.") 760. The ALJ thus found no evidence to support the unfair labor practice charges.

The Board reversed the ALJ's decision. *Irwin Indus., Inc.*, 304 N.L.R.B. No. 10 (Aug. 15, 1991), *reprinted in* A. 701. The Board agreed "that the unit in which bargaining was requested, i.e., *all* Irwin's maintenance employees (former Stockmar employees and its existing unrepresented work force), was appropriate" for purposes of bargaining. *Id.*, slip op. at 5–6. Nonetheless, the Board held that "the former Stockmar employees, acquired from the multiemployer unit on December 10, 1986, did *not* constitute, by themselves, an appropriate unit for collective bargaining between Irwin and the Union. This being so, [the Board found] no ground on which to rest a presumption of majority status for the Union." *Id.* at 5. In light of these findings, the Board ordered both Irwin and the Union to cease giving effect to the May 15, 1987 collective bargaining agreement executed between them. Affirmatively, the Board ordered Irwin to withdraw recognition of the Union, and required the Union to disclaim Irwin's recognition.[1]

## II. ANALYSIS

### A. *Standard of Review*

■ We uphold an order of the Board unless, upon reviewing the record as a whole, we conclude that the Board's findings are not supported by "substantial evidence," 29 U.S.C. § 160(e), (f) (1988), or that " 'the Board acted arbitrarily or other-

wise erred in applying established law to the facts' " of the case. *Teamsters Local Union No. 515 v. NLRB*, 906 F.2d 719, 722 (D.C.Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 767, 112 L.Ed.2d 786 (1991) (quoting *United Food & Commercial Workers Int'l Union v. NLRB*, 880 F.2d 1422, 1429 (D.C.Cir.1989)). Pursuant to this standard of review, a "reviewing court ... does not function simply as the Board's enforcement arm. It is our responsibility to examine carefully both the Board's findings and its reasoning...." *Peoples Gas Sys., Inc. v. NLRB*, 629 F.2d 35, 42 (D.C.Cir.1980); *see also Avecor, Inc. v. NLRB*, 931 F.2d 924, 928 (D.C.Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 912, 116 L.Ed.2d 812 (1992). In carrying out that responsibility here, we find that the record does not furnish substantial evidence to support the Board's conclusions and that the Board misapplied established law to the facts.

### B. *The Successorship Doctrine and Presumption of Majority Status*

■ An employer violates sections 8(a)(1) and (2) of the Act by recognizing a union that does not represent a majority of the employees in an appropriate bargaining unit. *See International Ladies' Garment Workers' Union v. NLRB*, 366 U.S. 731, 737–38, 81 S.Ct. 1603, 1607–08, 6 L.Ed.2d 762 (1961). And a union without majority support violates section 8(b)(1)(A) of the Act by accepting such recognition. *See id.* at 738, 81 S.Ct. at 1607–08. When an employer and a minority union enter into a contract that contains a union security provision, the employer violates section 8(a)(3) of the Act, and the union violates section 8(b)(2) of the Act. *See Local Lodge No. 1424, Int'l Ass'n of Machinists v. NLRB*, 362 U.S. 411, 412–14, 80 S.Ct. 822, 824–25, 4 L.Ed.2d 832 (1960).

---

1. The Board also found that Irwin had committed additional unfair labor practices relating to the coercive completion of dues deduction authorization forms and the use of those forms to deduct dues prior to the date permitted by the Act. *See id.* at 8. Finally, the Board found that the Union violated the Act by accepting dues after being on notice that the dues were deduct-

ed through coercively obtained authorizations. *See id.* The Union and Irwin have not contested these findings, and the Board's order with respect to these violations is therefore entitled to summary enforcement. *See Retail Clerks Union, Local 1401 v. NLRB*, 463 F.2d 316, 320 (D.C.Cir.1972).

■ The Board's determination that Irwin and the Union violated these provisions of the Act was based on its finding that the Union was not entitled to a presumption of majority status and that, absent that presumption, the Union had failed to demonstrate that it represented a majority of Irwin's refinery maintenance employees. We reject this determination, because it is at odds with the successorship doctrine and the presumption of continued majority status that arises pursuant thereto.

Under the successorship doctrine articulated in *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 107 S.Ct. 2225, 96 L.Ed.2d 22 (1987), a union's majority status will be presumed following a change in employers if the new employer is a "successor" to the old employer and a majority of the new employer's workers were employed by its predecessor. *Id.* at 41, 107 S.Ct. at 2234–35. A new employer is a successor to its predecessor if there is "substantial continuity" between the two enterprises. *Id.* at 43, 107 S.Ct. at 2236. The inquiry into "substantial continuity" is primarily factual, and is based on "the totality of the circumstances." *Id.* In particular, courts and the Board will examine

> whether the business of both employers is essentially the same; whether the employees of the new company are doing the same jobs in the same working conditions under the same supervisors; and whether the new entity has the same production process, produces the same products, and basically has the same body of customers.

*Id.; see also NLRB v. Burns Int'l Sec. Servs., Inc.*, 406 U.S. 272, 280 n. 4, 92 S.Ct. 1571, 1578 n. 4, 32 L.Ed.2d 61 (1972).

The fact-intensive inquiry into "substantial continuity" is undertaken with an emphasis on the employees' perspective. *Fall River*, 482 U.S. at 43, 107 S.Ct. at 2236; *see also International Union of Elec. Workers v. NLRB*, 604 F.2d 689, 694 (D.C.Cir. 1979); *Derby Refining Co.*, 292 N.L.R.B. 1015, 1015 (1989). The fundamental question is whether business "operations, *as they impinge on union members*, remain essentially the same after the transfer of ownership." *International Union of Elec. Workers*, 604 F.2d at 694 (emphasis added). This focus on the employees' view promotes industrial peace, for "[i]f the employees find themselves in essentially the same jobs after the employer transition and if their legitimate expectations in continued representation by their union are thwarted, their dissatisfaction may lead to labor unrest." *Fall River*, 482 U.S. at 43–44, 107 S.Ct. at 2236–37 (citing *Golden State Bottling Co., Inc. v. NLRB*, 414 U.S. 168, 184, 94 S.Ct. 414, 425, 38 L.Ed.2d 388 (1973)).

Viewed in light of the principles set out by the Court in *Fall River*, the facts of this case present a textbook example of successorship. There is no doubt that there was "substantial continuity" between Stockmar and Irwin. As the ALJ found, and the Board affirmed,

> [the] same employees continued to be employed by an employer operating in the same industry, at the same locations, performing the same work, in the same job classifications, at the same pay rates, using the same tools and equipment, and subject to immediate site supervision by the identical individuals who had supervised them when employed by Stockmar prior to that date.

ALJ Decision at 12, *reprinted in* A. 756. The record could not indicate more clearly that, from the employees' perspective, Irwin was a "successor" to Stockmar.

In addition to the clear presence of "substantial continuity" between the enterprises, the Board also found the other requirements necessary for the presumption of continued majority status. The first requirement is that "the majority of [the successor's] employees were employed by its predecessor." *Fall River*, 482 U.S. at 41, 107 S.Ct. at 2235. As we have noted, "an acquiring company need bargain with the predecessor employees' union only when the union constitutes more than 50% of the new bargaining unit." *Elastic Stop Nut Div. of Harvard Indus., Inc. v. NLRB*, 921 F.2d 1275, 1282 (D.C.Cir.1990) (emphasis omitted). Here, the Board found that on the date that the Union demanded recognition, the majority of Irwin's refin-

ery maintenance employees were former Stockmar employees. The second requirement is that the bargaining unit recognized by the successor must be appropriate. *See International Union of Elec. Workers*, 604 F.2d at 695; *NLRB v. Band–Age, Inc.*, 534 F.2d 1, 3–4 (1st Cir.1976). The bargaining unit recognized by Irwin encompassed the former Stockmar employees at the Chevron and Texaco sites, and the existing Irwin employees located at other refinery sites. The Board found that this bargaining unit was "clearly appropriate on traditional community-of-interest grounds...." *Irwin Indus., Inc.*, slip op. at 7. In short, under the principles of *Fall River* and prior case law, there is no doubt that Irwin was Stockmar's successor.

The Board does not dispute any of the foregoing analysis. Instead, the Board claims that, as a condition precedent for presuming continued majority status, the employees acquired from a predecessor must constitute an appropriate bargaining unit *on their own*, prior to being merged with the successor's employees. The Board insists that the Stockmar employees at the Chevron and Texaco plants did not themselves constitute an appropriate bargaining unit, and, therefore, that the Union is not entitled to a presumption of continued majority status. *See Irwin Indus., Inc.*, slip op. at 7. We reject the Board's decision because it is unsupported by substantial evidence and flatly at odds with prevailing Board precedent.

█ The Board concedes that, although the Stockmar employees at the Chevron and Texaco sites were acquired from a larger unit of employees, this fact alone is not dispositive of the successorship issue. *See id.* at 6 n. 4 (" '[s]uccessorship obligations are not defeated by the mere fact that only a portion of a former union-represented operation is subject to ... sale or transfer to a new owner' ") (quoting *Stewart Granite Enters.*, 255 N.L.R.B. 569, 573 (1981)). Indeed, the Board itself has found successorship even when very small groups of employees have been acquired from large predecessor units. *See, e.g., W & W Steel Co.*, 232 N.L.R.B. 74, 74–75 (1977),

*rev'd on other grounds*, 599 F.2d 934 (10th Cir.1979) (67 steel employees at one plant, 37 of whom were acquired from bargaining unit of 980 employees at seven plants); *Boston–Needham Indus. Cleaning Co., Inc.*, 216 N.L.R.B. 26, 26 n. 5, 27–28 (1975), *enforced*, 526 F.2d 74 (1st Cir.1975) (34 janitorial employees at one plant, 31 of whom were acquired from state-wide bargaining unit of 3000 such employees). The mere fact, therefore, that the 337 former Stockmar employees were drawn from a larger unit cannot defeat the successorship obligations that arose in this case.

The Board seeks to avoid this point by reiterating that there can be no presumption of continued majority status pursuant to a successorship unless the employees acquired from the predecessor employer constitute, *by themselves*, an appropriate unit for collective bargaining. *See Irwin Indus., Inc.*, slip op. at 6 & n. 4. But the cases that the Board cites do not support this proposition. Rather, these cases appear to suggest nothing more than that the acquired employees must be in appropriate units both before and after successorship. This is made clear by the Board's recent decision in *Hydrolines, Inc.*, 305 N.L.R.B. No. 40 (Oct. 15, 1991).

In *Hydrolines*, the Board found successorship where a new employer purchased water transportation routes from the predecessor and hired the predecessor's employees and equipment for those routes, while the predecessor continued to engage in the same business at other locations. *See id.*, slip op. at 17 & n. 32, 22. The Board made no finding that the group of acquired employees, by themselves, constituted an appropriate unit for bargaining prior to the successorship; indeed, such a finding was belied by the facts of the case. Rather, in finding a successorship, the Board in *Hydrolines* focused on the substantial continuity in employment, the majority status of the acquired employees in the new unit and the appropriateness of the new unit:

An employer ... may take over only a part of the operations of the predecessor and still be deemed a successor employ-

er. Also, successorship is not precluded because the entire bargaining unit is not transferred to the new employer.

\* \* \* \* \* \*

The Board ... has found successorship even though the alleged successor took over a part of the predecessor's operations, and thereby divided a bargaining unit that had consisted of a very homogeneous group of employees.

\* \* \* \* \* \*

Here, as in the former cases, the Respondents took over a significant portion of the predecessor's operation and continued to operate the acquired portion in a manner similar to that of the predecessor. Further, the unit sought by the Union constitutes a separate appropriate unit. The totality of the circumstances persuades us that the Respondents are a successor to [the predecessor employer].

*Id.* at 20–22 (footnotes omitted). The Board's holding in *Hydrolines* is controlling here.

Board counsel suggested that the finding of successorship in *Hydrolines* was based on the Board's recent certification of the original bargaining unit of all employees serving on the predecessor's vessels. This argument cannot possibly carry the day, however. In *Fall River,* the Supreme Court expressly held that "a successor's obligation to bargain [with the union] is not limited to a situation where the union in question has been recently certified." 482 U.S. at 41, 107 S.Ct. at 2235.

■ Likewise, the Board cannot defend its decision in this case on the ground that the acquired unit of Stockmar employees was part of a multiemployer unit. The Board has found that separation from a multiemployer unit does not defeat a finding that the unit acquired by a successor was appropriate. *See Boston–Needham,* 216 N.L.R.B. at 26–28 (single-plant unit acquired from multiemployer, multilocation unit); *Miles & Sons Trucking Serv., Inc.,* 269 N.L.R.B. 7, 14 (1984) (four-location unit acquired from multiemployer, multilocation unit). The Board provides us no good rea-

son to avoid application of this principle here.

■ In a parting argument, Board counsel attempted to defend the Board's decision on the ground that the Stockmar employees at Chevron and Texaco were "accreted" to the predecessor bargaining unit, rather than added pursuant to a certification election under section 9(c) of the Act, 29 U.S.C. § 159(c) (1988). Counsel argued that an accretion "weakens" the basis for finding a presumption of continued majority status for the Union, citing *Atlantic Technical Servs. Corp.,* 202 N.L.R.B. 169 (1973), *enforced sub nom. International Ass'n of Machinists v. NLRB,* 498 F.2d 680 (D.C.Cir.1974). We need not decide whether *Atlantic Technical* survives the Supreme Court's decision in *Fall River* or, if so, whether it is applicable to the facts of this case. The Board itself did not purport to rely on any "accretion" theory in rejecting successorship here; thus, counsel's overture on this point reflects nothing more than a *"post hoc* rationalization[ ]," which can have no bearing on our disposition of this case. *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168–69, 83 S.Ct. 239, 245–46, 9 L.Ed.2d 207 (1962) ("The courts may not accept appellate counsel's *post hoc* rationalizations for agency action ... an agency's discretionary order [may] be upheld, if at all, on the same basis articulated in the order by the agency itself....").

### III. Conclusion

For the foregoing reasons, we find that the Board's decision is not supported by substantial evidence and that the Board misapplied the successorship doctrine. Therefore, we deny the Board's petition and cross-petition for enforcement of its order against Irwin and the Union, and we grant the Union's petition for review.

*So ordered.*