498 F.2d 680
 86 L.R.R.M. (BNA) 2182, 162 U.S.App.D.C. 138,
74 Lab.Cas. P 10,001
 INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE
WORKERS, AFL-CIO, Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, Atlantic
Technical Services Corp., Intervenor.
ATLANTIC TECHNICAL SERVICES CORPORATION, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD Respondent, International
Association ofMachinists and Aerospace Workers,
AFL-CIO, Intervenor.
 Nos. 73-1231, 73-1501.
 United States Court of Appeals, District of Columbia Circuit.
 Argued March 7, 1974.
Decided May 7, 1974.
 
 Bernard Dunau, Washington, D.C., with whom Plato E. Papps, Washington, D.C., was on the brief, for petitioner in No. 73-1231 and intervenor in No. 73-1501.
 Leo P. Rock, Jr., Tampa. Fla., for petitioner in No. 73-1501 and intervenor in No. 73-1231.
 Joseph C. Thackery, Atty., N.L.R.B., with whom John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate Gne. Counsel, Elliott Moore, Asst. Gen. Counsel, and Robert Sewell, Atty., N.L.R.B., were on the brief, for respondent.
 Before HASTIE,* Senior Circuit Judge, and WRIGHT and ROBB, Circuit judges.
 HASTIE, Senior Circuit Judge:
 
 
 1
 This controversy and the National Labor Relations Board order we now review arose out of the refusal of an employer to bargain with a union.
 
 
 2
 On April 1, 1971, under a contract with the National Aeronautics and Space Administration, Atlantic Technical Services (ATS) commenced performance of mail and freight distribution services at Kennedy Space Center. Trans World Airways (TWA), the contractor which had performed these services for seven years prior thereto, had recognized the International Association of Machinists and Aerospace Workers (the Union) as the representative of its employees, including those who constituted the mail distribution service force. Terms and conditions of employment were controlled by a labor contract between TWA and the Union.
 
 
 3
 The record shows, and the administrative law judge found, that ATS thought it important to retain as many incumbent employees as possible, and wanted and offered to hire all of them. Shortly after the award of a new contract to ATS was announced, TWA helped ATS to set up interviews with the incumbent employees. There is no finding or evidence that anyone other than incumbents was informed of or invited to attend these interviews. At the interviews, and apparently before ATS offered positions, ATS officials advised the incumbents that fringe benefits under ATS would have to be substantially less than they had been under TWA. Of the 41 incumbents, 27 accepted the ATS offer. The positions of the 14 who declined were filled pursuant to applications solicited from the general public.
 
 
 4
 The administrative law judge ruled that ATS was obligated to bargain with the Union concerning initial terms of employment on takeover. However, the Board held that the duty to bargain arose only on April 9, as a result of an employer conducted poll of employees on that date which disclosed majority ad herence to the Union. In reaching this result the Board ruled that ATS was not a 'successor employer', and hence could have no obligation to the Union under the 'successor' doctrine as discussed and construed in N.L.R.B. v. Burns Int'l Security Services, inc., 1972, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61. Accordingly, the Board ordered no retroactive relief or 'make whole' remedy.
 
 
 5
 On petition for review, the Union contends that the action of ATS in rejecting collective bargaining and unilaterally changing terms and conditions of employment when it took over the mail distribution operation and work force was an unfair labor practice, a refusal 'to bargain collectively with the representatives of his employees' within the meaning of section 8(a)(5) of the National Labor Relations Act, as amended, 29 U.S.C. 158(a)(5). As a remedy, the Union asks that the employees be made whole for diminution of fringe benefits, retroactively to April 1, 1971.
 
 
 6
 Also before us is the Board's application for enforcement of its order that from now on the employer must recognize and bargain with the Union. ATS opposes the granting of any relief.
 
 
 7
 We have no doubt that ATS became obligated to bargain with the Union when its own poll disclosed union adherence by a majority of its employees. N.L.R.B. v. Sehon Stevenson & Co., Inc., 4th Cir. 1967, 386 F.2d 551; N.L.R.B. v. Nelson Mfg. Co., 6th Cir. 1964, 326 F.2d 397; Nation-Wide Plastics Co., Inc., 1972, 197 NLRB No. 136. A more substantial question is whether, as the Union contends, ATS was obligated to bargain with it over whatever changes in terms and conditions of employment this new employer contemplated upon takeover of the operation.
 
 
 8
 It is not contended that the TWA labor contract survived as such after April 1, when ATS, an unrelated entrepreneur, became the new employer of the mail service and distribution force. For a duty to bargain with the Union to survive the takeover there should be some significant indication that a majority of the employees concerned desired that the Union bargain for them collectively.[1]
 
 
 9
 In many situations the fact that a union has represented a group of employees in the past serves as a basis for a presumption of continuing employee adherence to it. But if the circumstances of a particular case destroy the logical basis without which the presumption cannot stand, the historic relation loses evidentiary significance.[2]
 
 
 10
 In this case, ATS interviewed the incumbent mail service employees of TWA individually and offered to continue them in their jobs upon the imminent ATS takeover of the enterprise, albeit with reduced fringe benefits, and 27 of the 41 agreed to accept the changed conditions of employment. On conflicting evidence, the Board permissibly found that on 'two separate occasions prior to (the April 1) takeover, but subsequent to these prehire interviews, the Union requested respondent to recognize it and make no changes in the terms and conditions of employment without first negotiating with the Union. Respondent, however, refused to recognize and bargain with the Union, claiming, inter alia, . . . that, at all times, it had reason to doubt the Union's continued majority status'.
 
 
 11
 If while working for the predecessor employer a majority of the 41 incumbents had made manifest their election to be represented by the Union and it had been certified as their bargaining representative, any doubt the new employer asserted about the Union's continued majority status might not have justified a refusal to bargain collectively. But the 41 employees who constituted the entire work force for the distinct and functionally separate operation of mailing and distributing items throughout a large installation had been added by 'accretion' to an established bargaining unit of some 1100 other employees of TWA at the Space Center. This had been accomplished in 1964 by mutual informal agreement of employer and union, apparently without opportunity for expression of assent or objection on the part of the 41 persons thus added to the bargaining unit. No occasion arose then or thereafter for a formal certification proceeding or determination of majority support. Thus the fact that the Union had represented these employees in the past has less evidentiary weight than it would after Board certification. It follows that no great amount of countervailing evidence is required for us to sustain the Board's finding. United States Molded Shapes, supra.
 
 
 12
 Here, in this unusual factual situation, in the absence of any historic manifestation of the representation preference of the mail and distribution employees, ATS undertook what in other circumstances would be the questionable action of dealing directly with the 41 individual workers concerning terms and conditions of employment to become effective April 1. And apparently the individuals thus approached acquiesced in these individual, rather than collective, negotiations. Moreover, as already pointed out, the Board found that the request of a Union official for recognition and collective bargaining was not made until after the new employer had arranged with the employees individually for their retention subject to reduced fringe benefits.
 
 
 13
 In N.L.R.B. v. Burns Int'l Security Services, Inc., supra, 406 U.S. at 294-295, the Supreme Court cautioned that even if a new employer is accorded 'successor' status, 'it may not be clear until the successor employer has hired his full complement of employees that he has a duty to bargain with a union, since it will not be evident until then that the . . . (union) represents a majority of the employees in the unit . . ..' On the record, this is such a case. There was no significant indication until April 9 that either the 27 incumbents or the 14 newcomers wished the Union to represent them. Whether or not ATS belongs in the 'successor' category,[3] the Union's pre-takeover claim of representative status had inadequate evidentiary support, historic or current, to require the new employer to bargain with it concerning initial terms and conditions of employment.
 
 
 14
 The order of the Board will be enforced.
 
 
 15
 So ordered.
 
 
 
 *
 Of the Third Circuit, sitting by designation pursuant to 28 U.S.C. 294(d) (1970)
 
 
 [1]
 On occasion such desire has been inferred from the circumstances that the union had been the representative chosen by the old employees, a group from which a majority of the new work force had been selected. Tom-A-Hawk Transit, Inc. v. N.L.R.B., 7th Cir. 1969, 419 F.2d 1025; Makela Welding, Inc. v. N.L.R.B., 6th Cir. 1967, 387, F.2d 40
 
 
 [2]
 See e.g., N.L.R.B. v. Richard W. Kaase Co., 6th Cir. 1965, 346 F.2d 24; United States Molded Shapes, 1963, 141 NLRB 357; American Concrete Pipe of Hawaii, Inc., 1960, 128 NLRB 720
 
 
 [3]
 We find it difficult to reconcile much of the Board's reasoning on the 'successorship' question in this case with its analysis in G.T. & E. Data Services Corp., 1971, 194 NLRB 719