**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**MIDDLEBORO FIRE APPARATUS, INC., Respondent.**

No. 78–1173.

United States Court of Appeals, First Circuit.

Argued Oct. 4, 1978.

Decided Dec. 20, 1978.

Alan Banov, Atty., Washington, D. C., with whom John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and Peter M. Bernstein, Atty., Washington, D. C., were on brief, for petitioner.

Lawrence M. Siskind, Brockton, Mass., with whom Ann-Louise Levine, Brockton, Mass., was on brief, for respondent.

Before COFFIN, Chief Judge, ALDRICH and BOWNES, Circuit Judges.

COFFIN, Chief Judge.

This case is before us on the Board's petition seeking enforcement of an order requiring, *inter alia,* that respondents Middleboro Fire Apparatus, Inc. (MFA) bargain with the United Electrical, Radio and Machine Workers of America (the union) as the exclusive representative of MFA's employees. The order is predicated on the successorship doctrine. *NLRB v. Burns International Security Services, Inc.,* 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972). Simply stated, if the Board finds on the totality of the circumstances that a change in ownership did not affect the "essential nature" of the former business, then the new enterprise must recognize and bargain with the union that represented the employees of the former business. *NLRB v. Band-Age, Inc.,* 534 F.2d 1, 3 (1st Cir. 1976); *NLRB v. Boston Needham Industrial Cleaning Co., Inc.,* 526 F.2d 74, 77 (1st Cir. 1975); *Tom-A-Hawk Transit, Inc. v. NLRB,* 419 F.2d 1025, 1026–27 (7th Cir. 1969). The exception to this rule relevant here permits the new employer not to bargain with the union if the employer could "reasonably have entertained a good-faith doubt" about the union's continued majority status. *Burns, supra,* 406 U.S. at 278, 92 S.Ct. at 1577; *Band-Age, supra,* 534 F.2d at 4.[1] Ours is not a de novo review. Rather, in evaluating the Board's conclusions, we must be mindful that these decisions are closely tied to the facts of each case and that the decision involves intricate line drawing. We will not reverse so long as the decision is supported by substantial evidence and is rational. *Boston Needham, supra,* 526 F.2d at 77.

Maxim Industries, Inc. (Maxim) is in the business of building fire fighting vehicles. Until the end of May, 1976, Maxim operated a service department employing fourteen men in a building separate from the main plant. The service department delivered vehicles to purchasers, provided service pursuant to warranties on Maxim products, and did other maintenance work on Maxim and other companies' products. Mr. Vadala was Maxim's Director of Service, and Mr. Haskins ran the service department.

The union was the exclusive bargaining representative of Maxim's employees, including those in the service department. In February of 1976, attempting to cope with financial difficulties, Maxim asked the union to sign a five year contract and to eliminate the service department from the

---

1. The Board made a point of saying that the correct standard should be "reasonable doubt based on objective circumstances". We are not sure that that standard is any different from the one articulated in the text. That the doubt must be reasonable lends an objective aspect to the test. A good faith doubt cannot arise solely from the employer's intuition. *J. Ray McDermott & Co., Inc. v. NLRB,* 571 F.2d 850, 859 (5th Cir. 1978). On the other hand, the test is also subjective to the extent that the Board must determine whether the employer could reasonably form a doubt on the basis of the information that was available to him. As the Ninth Circuit wrote, "an employer lawfully may withdraw recognition from an incumbent union because of its asserted good faith doubt of the union's continuing majority status, if that doubt is reasonable and supported by objective considerations." *NLRB v. Cornell of California, Inc.,* 577 F.2d 513, 515–16 (9th Cir. 1978).

bargaining unit. The union rejected the proposal. Finally Maxim decided to close down the service department effective May 19, 1976.

On May 20 Vadala, as sole stockholder, incorporated MFA. That same day MFA entered into service agreements with Maxim and another company in the industry obligating MFA to do repair, maintenance, and warranty work for the two manufacturers who, in turn, agreed to provide MFA two road service trucks and uniforms for road servicemen; to reimburse MFA for road service expenses; to supply to MFA parts and supplies at prices and terms established by the manufacturers; to pay MFA at rates prescribed in the agreement; and to make collections from MFA's customers. Also on May 20 MFA agreed with Maxim to lease the building that had housed Maxim's service department and to buy three vehicles from Maxim.[2] Maxim agreed to cover up to 15 MFA employees through December 31, 1976, in its existing group health plan, to maintain the existing garage owners liability policy until its expiration, to make cash advances to MFA, and to give MFA an option to purchase items in the service department inventory.[3]

Between May 19 and June 1, when MFA began operations, Vadala and Haskins, working as MFA's vice president, met with the Maxim service department employees. Vadala offered each one a job with MFA and explained that the options were to "bump" into the main Maxim plant or to take voluntary lay-off status. Many of the employees asked what the status of the union would be at MFA. To those who asked, Vadala responded that he had no obligation to bargain with any union. Seven Maxim workers accepted the offer, and they formed MFA's initial work force. Later MFA hired two people who had worked for Maxim and belonged to the union at an earlier period and one who had never been connected with Maxim.

The union first asserted their right to bargain on behalf of MFA's employees at a meeting with Vadala on May 20. Vadala responded that he did not believe he had any obligation to negotiate with the union. He added during a phone conversation later that day that he would check with a lawyer and would negotiate if he had to. On May 22 the union wrote Vadala requesting bargaining. Vadala, answering on May 25, stated that Maxim had dissolved and that MFA had no connection with Maxim. The union sent a second letter on June 1. On June 8 the union asked Vadala why there had been no response. Vadala explained that he had not received the letter and reiterated that he had a right to start a business without being compelled to negotiate. At this confrontation on June 8 Vadala apparently first suggested that he doubted the union had a majority at MFA.[4] A third letter was hand delivered to Vadala that afternoon. A fourth letter, requesting information about MFA's officers, directors, and stockholders, was sent June 24. Vadala never responded to the letters of June 8 or June 24.

We conclude that MFA's business is essentially the same as the business of the Maxim service department. As the ALJ wrote:

"Respondent undertook to perform the same services, utilizing former Maxim supervisors, on the same premises leased from Maxim, with the same employees, exercising the same skills and using the same type of tools and equipment, for the

---

2. "The fact that the transfer took the form of a lease rather than an outright sale is not of great significance for purposes of determining the rights and obligations under the Act." *NLRB v. Band-Age, Inc.,* 534 F.2d 1, 5 (1st Cir. 1976).

3. As of the hearing before the ALJ in March of 1977, MFA had purchased about $8,000 of about $200,000 worth of inventory.

4. Vadala testified that he expressed his doubts during the phone call on May 20. The union representative had no such recollection, and the ALJ apparently credited the union's version. The date of assertion is not important in this case, however, because neither the ALJ nor the Board relied on untimely assertion as a reason for rejecting MFA's defense. We reject the Board's effort in its brief to rely on belated assertions of doubt as an alternative basis for affirmance.

same market of customers, with virtually no hiatus in their employment."

MFA does more "refurbishing"[5] than Maxim did and is trying to expand into manufacturing firetrucks which the Maxim service department did not do, but these projects continue to use essentially the same skills and tools, albeit, perhaps, in a more creative manner. As the ALJ found, "activities of this nature are the normal concomitants of a new management and a new approach to a failing business, not a break in the continuity of the employing industry." Here, as in *Band-Age*, the successor "is reaping the advantages of continuity"[6] which helps justify according protection to "the employees' interest in some stability of representation during a period of volatility." *Band-Age, supra*, 534 F.2d at 4.

■ MFA points to the extreme reduction in workforce from the approximately 100 workers at Maxim to the 10 at MFA. Reduction in size is relevant, but by no means determinative. *Id.* MFA would distinguish *Band-Age* because there the predecessor employer ceased operations entirely, and the entire business shrank; whereas Maxim continues in existence and the successor is replacing only a portion of the former bargaining unit. The successor in *Ranch-Way, Inc. v. NLRB*, 445 F.2d 625, 627 (10th Cir. 1971) (enforcing order that successor honor predecessor's contract), however, was in the same position, having taken over but one feed mill from the predecessor, who continued to operate the rest of its business. We find no reason to believe that here the reduction would "significantly affect *employee* attitudes", *Band-*

*Age, supra*, 534 F.2d at 6 (emphasis added), so as to give a basis for ignoring the presumption of continued majority status.

Furthermore, this case is distinguishable from *International Ass'n of Machinists and Aerospace Workers v. NLRB*, 162 U.S.App.D.C. 138, 498 F.2d 680 (1974), on which MFA would rely. There the court enforced the Board's order refusing successorship status. The 41 employees of "the distinct and functionally separate operation of mailing and distributing items" had been joined by "accretion" to the much larger, pre-existing bargaining unit "without opportunity for expression of assent or objection on the part of the 41 persons thus added." *Id.* 162 U.S.App.D.C. at 141, 498 F.2d at 683. Accordingly, the mere fact that the union had represented those 41 gave no basis for a presumption that any of the 41 would choose the union. Here the carry-over employees had participated in choosing the union. While with the predecessor, the union represented them. They make up a majority of the successor's employees. *See Band-Age, supra*, 534 F.2d at 4 & n. 6. Therefore, under 29 U.S.C. § 159(a), the union is presumptively their exclusive representative. *See Burns, supra*, 406 U.S. at 277, 281, 92 S.Ct. 1571.

■ We turn now to the more difficult question whether MFA, as a successor employer, reasonably entertained a good faith doubt that the union continued to represent a majority of MFA employees. MFA would base its doubts on statements by the employees during the discussions in May of 1976. Certainly an employee's statement can form the basis for the employer's doubt

---

5. "Refurbishing" apparently implies extensive overhauling and differs from "servicing" or "repairing" mainly in the amount of work done on a particular vehicle rather than in the types of work done.

6. Evidence of the advantage reaped is the relationship between MFA and the manufacturers as established by the agreements signed on May 20. To quote the ALJ:

"Provisions of this nature are not common between independent business men, dealing at arms-length. Here the Companies retained control over prices, labor rates, bill-

ings, and collections. With such control the Companies had the power to determine Respondent's success or failure. It is clear, however, that the Companies opted for Respondent's success, not failure. Respondent and its employees were the beneficiaries of Maxim's continued application of the health provisions of its collective bargaining agreement with the Union until December 31. Moreover, and most significantly Maxim advanced Respondent sufficient working capital to assure Respondent an opportunity to succeed in its business venture."

as to that employee. *Zim's Foodliner, Inc. v. NLRB*, 495 F.2d 1131, 1140 (7th Cir. 1974). Statements are "objective, identifiable acts" on which other things being equal, an employer ought to be able to rely. Unlike the situation in *NLRB v. Cornell of California, Inc.*, 577 F.2d 513 (9th Cir. 1978), the employees here were voicing their own feelings, rather than claiming to represent other employees.[7]

This being so, MFA is able to make an appealing argument. Between May 19 and June 1 Vadala interviewed 6 of the 7 Maxim employees who opted to work for MFA. Some of the interviews were with individuals, some with groups. Vadala saw some several times. His testimony was that all or nearly all initiated discussion of union recognition by MFA and that when he replied that he had no obligation to bargain, each expressed some degree of satisfaction with Vadala's position or some degree of dissatisfaction with the union. MFA argues that such a sequence of statements, together with the option available to the employees to bump into the main plant and the close personal relationship between the employees and Vadala (with some discussions even taking place in a bar and at Vadala's home), were sufficient to rebut any presumption of continuing support for the union as bargaining representative.

This did not persuade the ALJ and Board who concluded that "[s]tatements made by employees during the course of an interview with a prospective employer that they approve of his unqualified position that he has no contract and is not obligated to bargain with the Union claiming to represent them are not voluntary, uncoerced expressions of employee sentiment upon which their employer can rely in asserting a good faith doubt of an incumbent union's majority status. So far as this record shows none of the Respondent's employees have withdrawn from the Union and all who were members of the Union have remained members in good standing." [8]

We have considerable sympathy for MFA, for if an employer does not establish a reasonable good faith doubt when a majority of his employees express their disaffection with the union, it may be asked when if ever he could do so. So put, the invited answer is almost irresistible. But not quite.

We may well feel that we would not have concluded on this record as did the Board. But we may not reverse unless we deem this a case of arbitrariness, irrationality, or abuse of judgment. This is, we conclude, a case where the Board's seasoned feel for the meaning of events in a labor-management setting must be allowed some scope. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *NLRB v. Matouk Industries, Inc.*, 582 F.2d 125, 128 (1st Cir. 1978). The weight to be given the employees' apprehension that Maxim might close and the consequent unreality of any option to bump; whether or not service employees faced more or less advantage in staying with Maxim than going with MFA; whether the factors of a few employees dealing with a prospective employer in a close relationship and informal surroundings were likely to mean more or less coercion; the interpretation of somewhat ambiguous statements; the weight to be given the nervousness observed in the employees and reported by Vadala; the

---

7. There is broad language in *Cornell* suggesting that "employee assertions" may not be reliable standing alone. *See, e. g.*, 577 F.2d at 517. We take that to mean that an employee's assertion concerning other employees' attitudes ought to be bolstered by some "special indicia of reliability". *Id.* We cannot imagine a better means of corroboration as to another employee than that employee's own free and uncoerced statement of hostility to the union.

8. This conclusion, with its general language, reads like a conclusion of law. If it were so intended, it would be wrong for the reasons explained in the text. Ordinarily in such a case we would feel compelled to remand for the Board to make a finding of fact under the correct standard of law. We do not think that final decision should be further delayed here, however, since the conjunction of several detailed circumstances listed in the ALJ's conclusion enables us, with some straining, to treat it as a factual finding. Obviously this kind of problem is one easily avoided by more careful expression.

weight to be given the fact that none of the employees ever gave up union membership or took any other action to support Vadala's attempt to avoid bargaining [9]—these are issues which permit more than one answer. They also call for the kinds of informed judgment based on experience in a field which lie beyond us. Not being able, therefore, to answer these questions with confidence, we cannot say that the Board's decision was an impermissible one.

We therefore hold that the Board's decision that Vadala lacked the requisite good faith doubt was rational and supported by substantial evidence.

*The order of the Board is enforced.*

---

**9.** The record discloses no attempt on the part of any of MFA's employees to de-certify the union by seeking a new election. 29 U.S.C. § 159(e)(1).