in the line for THCF assets. As the court below aptly noted:

> If stockholders were allowed to convert their stockholder/equity claims into creditor claims simply by alleging a joint conspiracy between the parent and subsidiary ... the policy, as well as the result, of *Stirling Homex* could be avoided whenever the allegedly defrauded stockholders were lucky enough to have invested in a company organized with separate subsidiaries.

 Where a corporation is organized as a single entity, all stockholder claims must be brought directly against the issuer; there are no opportunities to subvert the absolute priority rule. Under a rule that would grant appellants parity with the general creditors of THCF, creditors could find their equity cushion depleted by stockholder claims against subsidiaries of the issuer. We do not believe that the use of separate corporate forms is a valid reason for granting stockholders priority over general creditors.

### IV.

Finally, appellants argue that *U. S. Financial* directs subordination only of claims for fraudulent issuance of stock; they contend that claims for other torts—e.g., a stockholder injury caused by an employee's negligence—should not be subordinated merely because the claimant is a stockholder. We do not reach this issue. Although appellants characterize their claim as one for "interference with contractual relations," "inducement of [b]reach of [c]ontract" and/or "conspiracy to defraud," their claim is essentially that of defrauded stockholders, not victims of an independent tort.[5]

In any event, we see no principled basis for distinguishing the claim asserted by appellants and the claim asserted in *U. S. Financial*. Participation of a wholly-owned subsidiary in its parent's fraud is an equity risk assumed by the purchaser of stock. Where the allegedly independent tortfeasor is a wholly-owned subsidiary of the issuer, and the allegedly independent tort is participation in the parent's scheme to defraud the stockholder, the stockholder's claim against the subsidiary is indistinguishable from a claim against the issuer. Even if the fraudulent acts of THC and THCF give rise to more than one cause of action, the absolute priority rule directs subordination in each case. We hold that appellants' claim must be subordinated to the claims of THCF's depositors. The judgment is AFFIRMED.

**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**ENGLISH BROTHERS PATTERN AND FOUNDRY, Respondent.**

No. 81-7248.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 10, 1981.

Decided June 15, 1982.

---

Andrew F. Tranovich, Atty., NLRB, Washington, D. C., argued, for petitioner; Elliott Moore, NLRB, Washington, D. C., James S. Scott, Oakland, Cal., on brief.

Michele J. Silak, Littler, Mendelson, Fastiff, Tichy, San Francisco, Cal., for respondent.

Before DUNIWAY and BOOCHEVER, Circuit Judges, and QUACKENBUSH,* District Judge.

* The Honorable Justin L. Quackenbush, United States District Judge for the Eastern District of Washington, sitting by designation.

DUNIWAY, Circuit Judge:

In this case we grant the petition of the National Labor Relations Board for enforcement of its order.

## I. *Facts.*

The facts of this case are set out in *English Brothers Pattern and Foundry*, 253 NLRB No. 67 (1980). Seven of nine employees in the stipulated unit signed union authorization cards. On October 8, 1979, the day when union officials called on the employer, claiming to represent a majority of the unit employees, Clyde English, a partner in the firm, assembled all nine employees. He threatened to close the plant rather than bargain with a union and made promises of better pay and other benefits if the workers rejected the union. He also asked the employees to raise their hands if they wanted the union. Seven of the nine did so. After the meeting, Clyde approached five of the nine workers individually at their work stations and asked each if he wanted the union. Each said that he did. The employer refused to bargain with the union. The Board concluded that the polling was in violation of § 8(a)(1), 29 U.S.C. § 158(a)(1), and the subsequent refusal to bargain was in violation of § 8(a)(5), 29 U.S.C. § 158(a)(5). The Board's remedial order included an order that the employer bargain with the union.

## II. *The Bargaining Order and the § 8(a)(5) Violation.*

The employer objects to the bargaining order and to the Board's conclusion that the refusal to bargain was a violation of § 8(a)(5). If an employer conducts its own poll, and that poll shows a majority for the union, then the employer cannot disclaim the result but is bound to bargain with the union. *International Association of Machinists & Aerospace Workers v. NLRB*, D.C.Cir., 1974, 498 F.2d 680, 682; *Sullivan Electric Co. v. NLRB*, 6 Cir., 1973,

479 F.2d 1270, 1271–72. *See also NLRB v. Gissel Packing Co.,* 1969, 395 U.S. 575, 594, 89 S.Ct. 1918, 1929, 23 L.Ed.2d 547. In this case the employer conducted a poll when the workers were assembled and another of a majority of them individually. Thus, the employer *"knew,* through a personal poll . . . that a majority of his employees supported the union . . ." *(Gissel, supra,* at 594, 89 S.Ct. at 1929) and the bargaining order in this case was fully justified.

The employcr argues that the record does not show that Clyde saw the seven hands raised in response to his inquiry. Why did he ask the employees to raise their hands if he was not going to watch them do it? The argument is frivolous.

■ The Board's primary reliance was on the individual poll of the five separate employees. As to this, the employer argues that it was not a poll because its purpose was not to determine whether the employees desired to be represented by the union, but was to coerce and intimidate the employees. We decline to swallow this remarkable bit of sophistry. The Board has held that an employer does not violate § 8(a)(1) by polling the employees, provided that certain narrow conditions are met. *Struksnes Construction Co., Inc.,* 1967, 165 NLRB 1062, 1063. *See also NLRB v. Hawk Chevrolet, Inc.,* 9 Cir. 1978, 582 F.2d 491, 495. This, however, emphatically does not mean that when an employer conducts a poll in violation of § 8(a)(1) and learns from it that a majority of his employees want the union, the employer is not required to bargain with the union. To so hold would encourage violations of § 8(a)(1). We hold that if, in any poll conducted by the employer, whether lawfully conducted or not, the employer learns that a majority of the employees want the union, the employer must bargain.

In this case, the employer committed classic violations of § 8(a)(1). In doing so, it conducted two polls, and from them it learned, i.e., it *knew (Gissel, supra* ) that the union represented a majority of the employees. Thus, on the day of the polls, October 8, 1979, its duty was to bargain with the

union. Everything that has happened since has been a product of the employer's stubborn refusal to perform that duty. We will not reward that conduct.

In its brief, English Brothers argues at length that lapse of time and employee turnover make a bargaining order inappropriate. The question is not properly before us. It was not raised by English Brothers before the Administrative Law Judge or before the Board. Section 10(e) of the Act, 29 U.S.C. § 160(e) precludes raising it now. *Woelke & Romero Framing, Inc. v. NLRB,* 1982, —— U.S. ——, ——, 102 S.Ct. 2071, 2083, 72 L.Ed.2d 398.

The Board's order will be enforced.