**ALLENTOWN MACK SALES AND SERVICE, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 95–1272.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 15, 1996.

Decided May 21, 1996.

Stephen D. Shawe, Baltimore, MD, argued the cause and filed the briefs for petitioner. Frances O. Taylor entered an appearance.

Linda Dreeben, Supervisory Attorney, National Labor Relations Board, Washington, DC, argued the cause for respondent. With her on the brief were Linda R. Sher, Associate General Counsel, and Aileen A. Armstrong, Deputy Associate General Counsel. Peter D. Winkler, Supervisory Attorney, National Labor Relations Board, entered an appearance.

Before: SENTELLE, RANDOLPH, and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

Dissenting opinion filed by Circuit Judge SENTELLE.

RANDOLPH, Circuit Judge:

Mack Trucks, Inc. sold its truck dealership and repair shop in Allentown, Pennsylvania, to a company formed by three of the dealership's managers. The new company—Allentown Mack Sales and Service, Inc.—took over on December 21, 1990.

For many years before the sale, a union represented the dealership's parts and service employees. Before the sale, the bargaining unit consisted of 45 employees: 32 service mechanics, 11 parts employees, a shop clerk and a janitor. After Allentown Mack bought the dealership, it reduced the number of mechanics to 23 and the number of parts employees to 7. Of the 32 employees hired by the new company, all had formerly worked for Mack Trucks.

In February 1991, after the union demanded recognition, the new company conducted a poll of its employees by secret ballot to test their support for the union. A Roman Catholic priest supervised the polling; he alone

viewed the ballots and tallied the results. Nineteen employees voted against union representation; 13 voted in favor. Allentown Mack refused to recognize the union and the union filed unfair labor practice charges against the company with the National Labor Relations Board, which the Board sustained.

In this petition for review of the Board's decision, and the Board's cross-application for enforcement of its cease and desist order and its bargaining order, the pivotal issue is whether Allentown Mack violated §§ 8(a)(1) and 8(a)(5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and 158(a)(5), by conducting the poll and then refusing to recognize the union on the basis of the poll's results.

## I

An incumbent union enjoys a rebuttable presumption that it retains the support of a majority of the employees in the bargaining unit. *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 37–41, 107 S.Ct. 2225, 2232–35, 96 L.Ed.2d 22 (1987). An employer may overcome the presumption through objective indications sufficient to raise a reasonable doubt about the union's majority status, in which event the employer has three options. *See id.* at 41 n. 8, 107 S.Ct. at 2235 n. 8; *NLRB v. Curtin Matheson Scientific, Inc.*, 494 U.S. 775, 778, 110 S.Ct. 1542, 1544–45, 108 L.Ed.2d 801 (1990). The employer may simply withdraw recognition of the union; or it may seek a Board-conducted election—an "RM" election—pursuant to § 9(c)(1)(B), 29 U.S.C. § 159(c)(1)(B); or it may conduct a poll of employees, as Allentown Mack did here. *See Texas Petrochemicals Corp.*, 296 N.L.R.B. 1057, 1989 WL 224426 (1989), *remanded as modified*, 923 F.2d 398 (5th Cir.1991). An employer who withdraws recognition or conducts a poll without sufficient evidence of the union's loss of majority support commits an unfair labor practice.

Allentown Mack urges us to hold that the Board's standard for allowing polling—which is the same as that for withdrawing recognition and conducting an RM election—is too strict, that a lesser showing should suffice, and that if the lower standard had been applied in this case, the Board would have found the company's poll legal, and the results of the poll would then have justified the company's refusal to bargain. We will get to Allentown Mack's evidence of lack of union support, evidence it says warranted the taking of the poll. First we must deal with the company's challenge to the Board's rule that an employer may poll only if it has objective indications raising a reasonable doubt about the union's majority status.

Three courts of appeals have rejected the Board's standard because, they believed, it rendered employer polls useless.[1] In light of the Board's approach, these courts wondered why an employer would ever need to conduct a poll. The only proper purpose of a poll, according to the Board, is to determine the truth of a union's claim of a majority. *See Struksnes Constr. Co.*, 165 N.L.R.B. 1062 (1967). By using polls, employers can avoid making mistakes about the extent of employee support for the union. Yet the Board permits an employer to conduct a poll only when the employer already has "sufficient objective evidence to justify withdrawal of recognition from the union." *Mingtree Restaurant, Inc. v. NLRB*, 736 F.2d 1295, 1297 (9th Cir.1984). If polls are to be a "useful and legitimate tool" for employers with "sincere doubts" about the union's support,[2] the evidentiary standard for polling must be lower than the standard for withdrawing recognition. The Fifth, Sixth and Ninth Circuits therefore rejected the Board's standard and adopted their own, lower standard. Under the courts' standard, employers may conduct polls if they have "substantial, objective evidence of a loss of union support," as distinguished from a loss of the union's majority

1. *NLRB v. A.W. Thompson, Inc.*, 651 F.2d 1141, 1144–45 (5th Cir.1981); *Thomas Indus., Inc. v. NLRB*, 687 F.2d 863, 867 (6th Cir.1982); *Ming-* *tree Restaurant, Inc. v. NLRB*, 736 F.2d 1295, 1297–99 (9th Cir.1984).

2. *Thompson*, 651 F.2d at 1145; *Thomas Indus.*,

status.[3]

In the face of these decisions, the Board reconsidered its polling standard in *Texas Petrochemicals Corp.,* 296 N.L.R.B. at 1059–63, but decided to maintain it. The Board found it anomalous for the courts to allow an employer to conduct a poll—which has the same purpose as an RM· election, but lacks the procedural protections—when the Board would refuse to conduct an RM election because the employer could not satisfy the evidentiary standard.[4] The Board said it favored elections over polling and described polling as "potentially disruptive and unsettling." *Id.* at 1061–62. Nevertheless, the Board acknowledged the "right" of an employer to take a poll "on the basis of reasonable doubt about a union's majority status." *Id.* at 1061. The Board thought that even then polling could still serve an important role. Although an employer meeting the Board's "reasonable doubt" standard could cease recognizing the union, "there still remains an inherent uncertainty about whether the union has actually lost its majority support. . . . Rather than simply withdraw recognition from a union that might still in fact have majority support, an employer might wish first to poll its employees to obtain more certain, precise information about the union's support than is provided by its own reasonable doubt. The employer can then act with confidence and certainty in light of the results of the poll." *Id.* at 1063. The Board concluded that allowing polling only in these limited circumstances achieves the best balance between the employer's interest in testing employee support for the incumbent union, and the statutory goal of stable collective-bargaining relationships. *Id.* at 1062.

Neither the courts' analysis nor the ·Board's response is entirely satisfactory.

The courts' basic proposition—that the standard for polling should be lower than the standard for withdrawal of recognition—does not necessarily lead to the courts' conclusion that the Board's polling standard should be relaxed. The courts' objective could be accomplished by raising the Board's withdrawal-of-recognition standard. In deciding as they did, the courts have created the anomaly the Board identified, making it easier for an employer to conduct an unsupervised poll than to have a Board-supervised RM election. Furthermore, we do not understand why the courts thought there was something wrong in the Board's having a standard that rendered polling only marginally useful to employers. Nothing in the National Labor Relations Act specifically governs this practice. Polling employees about their support for an incumbent union is, the Board believes, "potentially, if not inherently, both disruptive of the collective-bargaining relationship . . . and also unsettling to the employees involved." *Texas Petrochemicals,* 296 N.L.R.B. at 1061. In light of these dangers, the Board, in its expert judgment, reasonably limited the circumstances in which employers may conduct polls. *Thomas Indus., Inc. v. NLRB,* 687 F.2d 863, 866–67 (6th Cir.1982), and *Mingtree Restaurant,* 736 F.2d at 1298, tout polling as a means by which employers may avoid the risk of bargaining with a minority union, itself a violation of § 8(a)(2). But the risk is nonexistent. The employer is protected by the presumption of the union's continuing majority status. *See* Joan Flynn, *A Triple Standard at the NLRB: Employer Challenges to an Incumbent Union,* 1991 WIS.L.REV. 653, 665, 667–70.

As to the Board's reasoning in *Texas Petrochemicals,* it seems to us inconsistent for

687 F.2d at 869; *Mingtree Restaurant,* 736 F.2d at 1299.

**3.** *Thompson,* 651 F.2d at 1145; *Thomas Indus.,* 687 F.2d at 869; *Mingtree Restaurant,* 736 F.2d at 1299.

**4.** The Board put it this way:
   It would be anomalous to on one hand require an employer to show sufficient objective considerations on which to base· a reasonable doubt about an incumbent union's majority support in order to have a formal, Board-

conducted RM election for the purpose of determining the union's majority support, while on the other hand permitting that same employer to conduct an in-house, relatively informal poll for the same purpose, with the same serious potential consequences for the union and the employees, on the basis of a significantly less stringent evidentiary predicate, i.e., the courts' "loss of support" standard.
*Texas Petrochemicals Corp.,* 296 N.L.R.B. at 1060.

the Board to say that RM elections are the preferred method for testing employee support of the union, 296 N.L.R.B. at 1061, and yet maintain the same evidentiary standard for allowing polling. The Board's statements about RM elections "lead squarely to the conclusion that the polling standard should be *more* stringent than that for RM elections." 1991 WIS.L.REV. at 660. But suppose the Board is correct that because polling and RM elections enable employers to test union support, the same evidentiary standard should apply. How then can the Board justify applying the identical standard to an employer's decision to withdraw recognition, a decision lacking any procedural safeguards? The Board's analysis, it seems, should have led it to impose a more stringent evidentiary standard on employers who withdraw recognition without having the results of a poll or an RM election. *Id.*

As between the decisions of the three courts of appeals and the Board, we believe the Board has the better of it, and not simply because it is the agency charged with administering the National Labor Relations Act. The only issue here relates to polling. It may be that the Board should set a higher standard for withdrawals of recognition and a lower standard for RM elections, but those questions are not before us and, at any rate, we could not answer them without first choosing a baseline from which to measure "higher" and "lower." Nothing we have seen justifies our disregarding the Board's choice and replacing it with a judicially-created lower standard for polling. The Board's system has its faults, but so does the one created by the courts. In this situation, the only proper course is for us to defer to the Board. *Fall River,* 482 U.S. at 42, 107 S.Ct. at 2235; *Beth Israel Hosp. v. NLRB,* 437 U.S. 483, 500–01, 98 S.Ct. 2463, 2473–74, 57 L.Ed.2d 370 (1978). The Board, not the courts, has "the primary responsibility for developing and applying national labor policy." *NLRB v. Curtin Matheson Scientific, Inc.,* 494 U.S. at 786, 110 S.Ct. at 1549.

## II

■ Applying its evidentiary standard for polling, the Board found that Allentown

Mack had not satisfied it. According to the Board, only 7 of the 32 employees in the bargaining unit made statements repudiating the union, far short of the number needed to raise doubts about the union's majority support. Allentown Mack challenges this conclusion on the ground that the Board should have counted several other employees among the group not favoring the union.

Of the employees the Board refused to count, three—Pete McArthur, Dennis Wehr, and Randy Zoltack—were not members of the bargaining unit on January 25, 1991. That is the date of Allentown Mack's letter to the union refusing recognition and announcing the poll. We see no basis for disagreeing with the Board's use of January 25 as the date for assessing the company's compliance with the polling standard. The letter was the company's first communication with the union after the union's demand for recognition on January 2. By the date of the letter, Allentown Mack had already decided to take the poll. It follows that the views of employees who were hired after January 25 could not support the company's decision. And the Board had sufficient reason not to count employees who were, by that date, no longer working for the company. The question, as the Board framed it, was whether on January 25 Allentown Mack reasonably doubted whether a majority of the employees then working supported the union.

The Board discounted the statements of two other employees—Mike Ridgick and Dennis Marsh. After being told during a job interview that the new company would be non-union, Ridgick said that "as long as the new company would treat them right, there was no need for a union." Allentown Mack thinks it significant that in 1986 Ridgick had asked a manager about decertifying the union, but the ALJ found the 1986 statement too remote to be probative of Ridgick's union sympathies in 1991. The ALJ also found Ridgick's statement during the interview "at best equivocal." Why, the ALJ asked, would Ridgick have expressed any prounion sentiment during a job interview, especially after having been told that the new company would be non-union? As to Marsh, he said during his job interview that he was paying

$35 a month in union dues and not getting his money's worth. The ALJ found that Marsh's expression of dissatisfaction with the union did not mean he wanted the union to stop representing him and the other employees.

The Board had good reason to agree with the ALJ about both of these employees. Board precedent holds that an employer may not rely on an employee's anti-union sentiments, expressed during a job interview in which the employer has indicated that there will be no union. Such employee expressions are unlikely to be sincere. *Middleboro Fire Apparatus, Inc.*, 234 N.L.R.B. 888, 894, 1978 WL 7283, *enforced*, 590 F.2d 4, 9 (5th Cir. 1978). Board precedent also holds that an employee's statements of dissatisfaction with the quality of union representation may not be treated as opposition to union representation. *Destileria Serralles, Inc.*, 289 N.L.R.B. 51, 1988 WL 214114 (1988), *enforced*, 882 F.2d 19 (1st Cir.1989); *Wagon Wheel Bowl, Inc. v. NLRB*, 47 F.3d 332, 335–36 (9th Cir. 1995).

Allentown Mack also invoked the statements of two employees—Kermit Bloch and Ron Mohr—as evidence of the views of other workers in the unit. Bloch told a manager that the entire night shift, consisting of five or six employees, did not want the union. The ALJ refused to credit this because Bloch did not testify and thus did not explain how he formed his opinion. Also, there was no evidence that any of the night shift employees made independent representations to the company about their union sympathies, and none of those employees testified at the hearing. Mohr, who was the union steward for the service department, told a manager that if a vote was taken, the union would lose and that he did not think the employees wanted a union. The ALJ rejected Mohr's statement, calling it an "almost off-the-cuff" remark and an "unverified assertion." Mohr did not testify about how he formed his opinion or about which employees—only those in the service department or all employees in the unit—he had in mind. Allentown Mack is not correct that the Board, in adopting the ALJ's findings, contradicted its precedent and ours. The Board has consistently questioned the reliability of reports by one employee of the antipathy of other employees toward their union. *See Westbrook Bowl*, 293 N.L.R.B. 1000, 1001 n. 11, 1989 WL 223989 (1989); *Louisiana–Pacific Corp.*, 283 N.L.R.B. 1079, 1080 n. 6, 1987 WL 89647 (1987); *Sofco, Inc.*, 268 N.L.R.B. 159, 160 n. 10, 1983 WL 24722 (1983); *Bryan Mem. Hosp. v. NLRB*, 814 F.2d 1259, 1262 (8th Cir.), *cert. denied*, 484 U.S. 849, 108 S.Ct. 147, 98 L.Ed.2d 103 (1987); *NLRB v. Cornell of California, Inc.*, 577 F.2d 513, 516 (9th Cir.1978). The two cases Allentown Mack cites—*Naylor, Type & Mats*, 233 N.L.R.B. 105, 1977 WL 9263 (1977), and *American Mirror Co.*, 277 N.L.R.B. 1626, 1986 WL 53709 (1986)—are distinguishable. In both, the information the employer received about other employees was, unlike the information the company relied on here, specific and detailed. As to shop steward Mohr, it is true that the Board and this court have held that a company may sometimes rely on a union official's admission that the union lacks majority support. *See Universal Life Insurance*, 169 N.L.R.B. 1118, 1119 (1968); *Lodges 1746 & 743, Int'l Ass'n of Mach. & Aero. Workers v. NLRB*, 416 F.2d 809, 812–13 (D.C.Cir.1969), *cert. denied*, 396 U.S. 1058, 90 S.Ct. 751, 24 L.Ed.2d 752 (1970). But, for the reasons given by the ALJ, Mohr's statement did not have sufficient indicia of reliability to justify the company's treating it as a reflection of the views of a majority of the workers in the unit.

We therefore sustain the Board's decision, as supported by substantial evidence, that only 7 of the 32 employees had repudiated the union and that Allentown Mack did not have a reasonable doubt about the union's continuing majority status.

### III

■ As part of its remedy, the Board ordered Allentown Mack to bargain with the union, and barred it from challenging the union's majority status for a reasonable period of time. The company objects to this portion of the order on the grounds that the Board did not explain why the bargaining order was necessary and did not weigh the need for union protection against the compet-

ing interest of employee choice. *See Exxel/Atmos, Inc. v. NLRB,* 28 F.3d 1243, 1248 (D.C.Cir.1994); *Charlotte Amphitheater Corp. v. NLRB,* 82 F.3d 1074, 1077–78 (D.C.Cir.1996). But Allentown Mack never raised this objection before the Board and it presented no evidence regarding the propriety of a bargaining order. The Board does not have an "affirmative duty" to consider the sort of challenge the company makes here. *Charlotte Amphitheater,* 82 F.3d at 1079. "No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 160(e). There were no "extraordinary circumstances." Allentown Mack has no excuse. The ALJ's decision recommending a bargaining order gave the company fair warning that one might be in the offing. And after the Board ruled, the company could have, but did not, move for reconsideration. *See Corson & Gruman Co. v. NLRB,* 899 F.2d 47, 49–50 (D.C.Cir.1990).

*Petition for review denied, cross-petition for enforcement granted.*

SENTELLE, Circuit Judge, dissenting:

At the outset of this dissent, a brief review of the underlying facts and the result reached by the Board and the majority is in order. Allentown Mack, a new company, undertook operations by hiring thirty-two of the forty-five employees of a predecessor company. The bargaining unit in the predecessor company had been represented by a union. The union demanded recognition. Seven of the thirty-two bargaining unit employees made unequivocal statements that they did not desire to be any longer represented by the union. Another employee, not counted among the seven, asked a management employee about de-certifying the union. Another employee, indeed a union steward, told the branch manager that the employees did not need a union. Still another employee in his employment interview stated that he was not being represented for the $35.00 he was paying. One of the seven who made the statements of wishing not to be unionized, also stated that "the entire night shift did not want the union." Another employee, the shop steward in the largest of the two departments in the bargaining unit, told the manager that "with a new company, if a vote was taken, the union would lose and that it was his feeling that the employees did not want a union."

Based on these expressions of union disinterest from the employees, the company management conducted a poll supervised by a Roman Catholic priest. There is no finding by the Administrative Law Judge ("ALJ") or the Board that the company conducted the poll in any unfair or improper manner whatsoever. In the poll, the employees rejected the union by a margin of 19-to-13. The ALJ found, the Board concluded, and the majority today affirms that "the respondent lacked a reasonable doubt of the union's continued majority status...." *Allentown Mack Sales,* 316 N.L.R.B. 1199, 1200, 1995 WL 221136 (1995). Based on that conclusion the Board not only adjudged that the employer committed the unfair labor practice by refusing to bargain with the union that commanded thirteen of thirty-two votes, but also placed the employer under a bargaining order amounting to a bar against de-certification of a union with only 40% support.

I do not suggest that our decisions should be result-driven. I do not even suggest that in every instance in which an administrative agency's application of the law yields a bizarre result a petition for review should be allowed; but when such a result does occur, that application of the law should be closely scrutinized, particularly when other courts have avoided that result. When the law becomes divorced from logic and from the common sense of the people who live under it, then the Dickens character Mr. Bumble who declared that "the law is a ass" becomes most believable.[1] The Board's rule, establishing that an employer cannot conduct a poll to determine majority support unless it

---

1. CHARLES DICKENS, OLIVER TWIST 399 (New Oxford Illustrated Dickens ed., Oxford University Press 1966) (1838).

already has so much evidence of no majority support as to render the poll meaningless, is just such an application. The three other circuits who have examined this question have unanimously concluded that the Board's rule cannot stand.

A Fifth Circuit decision in *NLRB v. A.W. Thompson, Inc.*, 651 F.2d 1141 (5th Cir. 1981), began with the indisputable proposition that under the NLRA an employer must bargain with a union which represents the majority of the employees but must not bargain with the union that does not have majority support, and that a violation of either of these duties is an unfair labor practice under § 8(a)(1). The court further noted that the NLRB had recognized in *Struksnes Construction Co.*, 165 N.L.R.B. 1062 (1967), that a union support poll is a "valid and helpful" device for the testing of union sentiment.[2] Reasoning from these underlying principles, the *Thompson* court expressly held that:

> when an employer "has not engaged in unfair labor practices or otherwise created a coercive atmosphere," it may, after giving notice to the union, poll the employees for their union sentiment if there is other substantial, objective evidence of a loss of union support (even if that evidence is not sufficient by itself to justify withdrawal) and if the poll meets the procedural guidelines set out in *Struksnes*.

*A.W. Thompson, Inc.*, 651 F.2d at 1145 (quoting *Struksnes*, 165 N.L.R.B. at 1063).

In *Mingtree Restaurant, Inc. v. NLRB*, 736 F.2d 1295 (9th Cir.1984), the Ninth Circuit faced the same question and reached the same conclusion. Like the Fifth Circuit, the Ninth held that polling is a "useful and legitimate tool for the employer who is in sincere doubt of the union's majority status," and "therefore h[e]ld ... that as long as the employer complies with the *Struksnes* conditions and procedural safeguards, it may poll its employees to determine their union sentiment if it has substantial, objective evidence of a loss of union support, even if that evidence is insufficient by itself to justify withdrawal of recognition...." *Id.* at 1299.

The Sixth Circuit, in *Thomas Industries, Inc. v. NLRB*, 687 F.2d 863 (6th Cir.1982), discussed the question with reasoning particularly helpful in the instant case. That Circuit noted the dilemma of the employer who would commit an unfair labor practice if it refused to bargain with a union having majority support or did bargain with a union which did not enjoy that support. The Circuit further noted that a union enjoying certified majority support was entitled to a presumption of continuing support, but that the presumption became rebuttable after one year and that the year had passed in the *Thomas* case well before the poll was taken. *Id.* at 867. As did the Fifth and Ninth Circuits, the Sixth Circuit held "that an employer may poll its employees to determine their union sentiment if it has substantial, objective evidence of a loss of union support, even if that evidence is insufficient in itself to justify withdrawal." *Id.*

In the *Thomas Industries* case, an ALJ had found that approximately one-fourth of the employees had made negative statements concerning representation. On that and other evidence, he found that the company had no objective basis to doubt the majority support for the union and held the polling to be a § 8(a)(1) violation. *Id.* The Board concurred. The court reversed, holding: "We find no substantial evidence to support the Board's conclusion that the Company did not have a good faith doubt as to the Union's majority status." *Id.* at 868. Just so in the present case.

Indeed, the present case is, if anything, a stronger one for rejecting the Board's approach than was *Thomas*. The *Thomas* court noted that the presumption of continuing majority status "was rebuttable since more than one year had passed" since the certification. *Id.* at 867. The emerging bargaining unit at Allentown Mack had never been literally sampled for majority support. Its thirty-two employees were drawn from a larger unit previously represented, and it is of course the law that a successor employer inherits the bargaining obligation of its pre-

---

**2.** Concededly, the *Struksnes* opinion was not genuinely on point either in *Thompson* or in the instant case as it dealt with initial certification rather than de-certification holding, but that would not seem to affect pertinent reasoning.

decessor. *Fall River Dyeing and Finishing Corp. v. NLRB*, 482 U.S. 27, 36–41, 107 S.Ct. 2225, 2232–35, 96 L.Ed.2d 22 (1987). Nonetheless, the factual underpinnings for the presumption of continuing status obviously are weaker when a unit contains less than all of the previously certified employee group.[3] As in the *Thomas Industries* case, the ALJ and the Board affirming the ALJ offer nothing of record to support their conclusion that the polling employer lacked a good faith doubt as to the union's majority status. I find it arbitrary and capricious of the Board to find that the employer committed unfair labor practices in the face of overwhelming unrefuted evidence that the union lacked majority support, including a poll taken with the utmost in safeguards for fairness and objectivity.

As there is no suggestion of unfairness in this case and there is overwhelming objective evidence of the loss of majority support, I would hold that the Board reached the wrong conclusion.

**3.** By way of example, if the 45 employees in the prior unit had been split at 23-to-22 in achieving the prior majority, without any change of sentiment on the part of any employee, the majority status would cease to exist if the 13 no longer employed unit members were split 8-to-5 in favor of the union, an event not statistically unlikely.